**FEDERAL INSURANCE COMPANY,**
**Plaintiff,**

v.

**SAMMONS FINANCIAL GROUP, INC., Midland National Life Insurance Company, and North American Company for Life and Health Insurance, Defendants.**

No. 4:08–cv–00288.

United States District Court,
S.D. Iowa,
Central Division.

Feb. 4, 2009.

---

Karen Y. Bonvalot, Stanley J. Lehman, Sherrard German & Kelly, PC, Pittsburgh, PA, Jeff H. Jeffries, Hopkins & Huebner, Des Moines, IA, for Plaintiff.

Tyrone R. Childress, Amy J. Fink, Tara C. Kowalski, Howrey LLP, Los Angeles, CA, Wade R. Hauser, III, Ahlers & Cooney PC, Des Moines, IA, for Defendants.

ORDER ON DEFENDANTS' MOTION
TO DISMISS, STAY, OR
TRANSFER

ROBERT W. PRATT, Chief District Judge.

On August 21, 2008, Sammons Financial Group, Inc. ("Sammons"), Midland Nation-

al Life Insurance Company ("Midland"), and North American Company for Life and Health Insurance ("NACOLAH") (collectively "Defendants") filed a Motion to Dismiss for Failure to State a Claim upon Which Relief Can be Granted or in the Alternative to Stay Action or in the Alternative to Transfer Venue (hereinafter "Motion") in the present action. Clerk's No. 11. Plaintiff, Federal Insurance Company ("Federal"), resisted the Motion on September 8, 2008. Clerk's No. 19. Defendants filed a Reply on September 19, 2008 and requested an oral hearing. Clerk's No. 29. A hearing was held on December 17, 2008. Clerk's No. 35. The matter is fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sammons is a financial services holding company that owns stock in insurance subsidiaries. Horvat Decl. ¶ 3. Sammons itself has no employees, and it is not licensed to and does not conduct insurance business in any jurisdiction. *Id.* ¶¶ 3–4; Compl. ¶ 2. Sammons is incorporated in Delaware with its principal office and place of business in South Dakota. Horvat Decl. ¶ 3. Sammons' insurance subsidiaries include Midland and NACOLAH. *Id.* ¶¶ 3–4; Compl. ¶¶ 2–4. Midland and NACOLAH are both corporations organized under the laws of Iowa; Midland's principal place of business is Iowa and NACOLAH's principal place of business is Illinois. Horvat Decl. ¶¶ 3–4.

Federal is a stock insurance company incorporated in New Jersey with its principal place of business is Chicago, Illinois. Compl. ¶ 1. Federal issued an excess insurance policy ("Excess Policy") to Sammons, which supplements a professional liability insurance policy ("Primary Policy") issued by Indian Harbor Insurance Company ("Indian Harbor") to Sammons.[1] *Id.* ¶ 46; Compl. Ex. B.; Defs.' Reply at 4–5. Defendants have filed claims with Federal for coverage under the Excess Policy. Federal filed the present action to clarify its obligations regarding these claims. The parties' dispute over coverage is based on several portions of the Primary and Excess Policies, set forth below.

### A. *Relevant Contract Provisions*

The terms of the Excess Policy's coverage are largely established by the Primary Policy, incorporated into the Excess Policy by reference. *See* Compl. Ex B; *see also* Compl. ¶¶ 34, 40. The Primary Policy provides coverage for "Insured Loss from Claims first made against the Insured during the Policy Period or ... for Wrongful Acts first committed on or after the Retroactive Date." Compl. ¶ 16. "Wrongful Act" includes "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an Insured in rendering, or failing to render Professional Services," as well as "any actual or alleged act, error, or omission of an Outside Service Provider ... [or] Independent Insurance Agent for which the Insurance Company is alleged to be liable...." *Id.* ¶ 18. "Loss" is defined, in pertinent part, by Section II(I) of the Primary Policy:

> "Loss" means damages, judgments, awards, settlements, and the Defense Expenses which an Insured is legally obligated to pay as a result of a Claim. Loss includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed.... Loss shall not include:

---

1. The Primary Policy has a $10 million limit per claim, subject to a $5 million retention. Compl. Ex. A at 1. Indian Harbor is not a party to the present action and appears to have paid the Primary Policy's full $10 million policy limit with regard to the Class Actions. Defs.' Br. in Supp. of Mot. at 1.

(1) fines, sanctions, taxes, penalties imposed by law or any multiplied damage award which is in excess of the damages award so multiplied;

(2) matters which are uninsurable under the law pursuant to which this Policy shall be construed;

(3) salaries, wages, fees, or other compensation, overhead, or benefit expense of any insured;

(4) fees, commissions, compensation, or interest charged to or due from clients or customers of the Insurance Company;

(5) the cost of complying with any settlement for, or award of, non-monetary relief; or

(6) any amount due under any contract or policy of insurance or reinsurance underwritten, issued, assumed, or subscribed to by the Insurance Company.

Compl. Ex. B at 6. Thus, both the Primary and Excess Policies provide indemnification for settlements and damages arising from a lawsuit against the Defendants, as well as compensation for reasonable legal fees incurred by Defendants in their defense of such lawsuits. The payment of Defense Expenses may be subject to "a written undertaking ... guaranteeing the repayment ... if it is finally determined that Loss incurred by such Insured would not be covered." Compl. Ex. A at 13. The defense costs alone may exhaust the Limit of Liability, which is $10 million under the Excess Policy. Compl. ¶¶ 21, 25; Compl. Ex. B at 4.

The Excess Policy, by its own terms and by incorporating the terms of the Primary Policy, contains four coverage exclusions relevant to this Declaratory Judgment: (1) the Fraudulent Act exclusion; (2) the Intentional Act exclusion; (3) the Profit or Advantage exclusion; (4) and the Representation of Performance or Value exclusion. Compl. ¶¶ 101–120. The Fraudulent Act, Intentional Act, and Profit or Advantage exclusions, set forth in Section III(A)(1)-(3) of the Primary Policy, as amended by Endorsement Number 7, provide in pertinent part as follows:

The Coverage under this Policy does not apply to any Claim ... brought about or contributed to in fact by:

(1) [Fraudulent Act exclusion—] any dishonest, fraudulent or criminal act or omission by an Insured, Independent Insurance Agent, or Outside Service Provider;

(2) [Intentional Act exclusion—] any willfull [sic] or intentional violation of any statute, rule or law by an Insured, Independent Insurance Agent, or Outside Service Provider; or

(3) [Profit or Advantage exclusion—] the gaining of any profit, remuneration or advantage by an Insured, Independent Insurance Agent, or Outside Service Provider to which the Insured, Independent Insurance Agent, or Outside Service Provider was not legally entitled;

provided, that this EXCLUSION (A) shall not apply to (i) any Claim for fraud and/or bad faith in claims handling or adjusting or (ii) an Insured unless it is established that the Insured participated in or acquiesced in the dishonest, fraudulent or criminal act or omission, the willful or intentional violation, or the gaining of profit, remuneration or advantage as determined by a final adjudication in the underlying action or in a separate action or proceeding.

Compl. Ex. A at 8, 26. The Representation of Performance or Value exclusion, set forth in Section III(J) of the Primary Policy, provides:

The Coverage under this Policy does not apply to any Claim ... based on or

directly or indirectly arising out of or resulting from:

(1) any estimate of costs; or

(2) any representation or promise regarding any payment of dividends or the performance of value of any product with any investment component.

*Id.* at 8–9.

In addition to the exclusions described above, the Primary Policy and Excess Policy both contain provisions which limit coverage of claims that are related or substantially similar to previous and pending claims that predate the coverage period, which under the Excess Policy is the two-year period between November 7, 2004 and November 7, 2006. Compl. ¶ 9; Pl.'s Request for Judicial Notice (hereinafter "RJN") Ex. 2 at 4. The Primary Policy Section IV(A)(4) provides: "All Related Claims [2] will be treated as a single Claim made when the earliest of such Related Claims was first made or when the earliest of such Related Claims is treated as having been made with [Section IV(A)(2)], whichever is earlier." Compl. Ex. A at 12. Similarly, Section 7 of the Excess Policy provides:

> [Federal] shall not be liable under [the Excess Policy] for any loss which is based upon, arises from or is in consequence of any demand, suit or other proceeding pending, or order, decree or judgment entered against any Insured on or prior to the Pending or Prior Date set forth in Item 8 of the Declaration [(November 7, 2004)], or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

Compl. Ex. B at 7. Finally, Endorsement Number 3 of the Excess Policy provides:

It is understood and agreed that the Company shall not be liable to make any payment for loss in connection with any claim based upon, arising out of, relating to, in consequence of, or in any way involving:

(1) any litigation, arbitration, claims, demands, causes of action, equitable, legal or quasi-legal proceedings, decrees or judgments (collectively referred to as litigation) against any insured occurring prior to or pending as [sic] November 7, 2004, of which the Insured has received notice or otherwise had knowledge as of such date; or

(2) any subsequent litigation arising from, or based on substantially the same matters as alleged in the prior or pending litigation included in (1) above; or

(3) any Wrongful Act of the insured which gave rise to the prior or pending litigation included in (1) above.

Compl. Ex. B at 14.

Neither the Primary nor the Excess Policy contain a choice of law provision. *See* RJN Ex. 1. The Primary Policy states that the "policy applies to any Wrongful Act occurring and any Claim made anywhere in the world." *Id.* at 60. However, the Primary and Excess Policy list Sammon's contact at a West Des Moines, Iowa address, and the Excess Policy contains an Iowa amendatory endorsement. *Id.* at 42, 78, 84–85.

**B.** *The Claims Against Defendants*

Within the Federal coverage period, the following fourteen claims, brought against Midland and NACOLAH by, or on behalf of, insurance consumers, were submitted to Federal: three class actions ("Class Ac-

---

**2.** " 'Related Claims' means all Claims for Wrongful Acts based on or directly or indirectly arising out of or resulting from the same or related facts, circumstances, situa-

tions, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events." Compl. Ex. A at 7.

tions"), ten individual actions filed in state courts in Florida, Michigan, and California ("Individual Actions"), and one action brought by the Minnesota Attorney General ("AG Action") (collectively "Submitted Matters"). Compl. ¶¶ 46–57; Pl.'s Resistance at 5–6. All of these lawsuits arise from allegations that Defendants were involved in the improper marketing of long-term annuities to senior citizens. Compl. ¶ 45; RJN Ex. 2 at 8. In addition to these claims, which all arose during the Excess Policy's coverage period, Federal has identified three additional individual actions, filed in Florida state court before November 7, 2004, that contain allegations that Defendants were involved in the improper marketing of longterm annuities to various senior citizens ("Prior or Pending Litigation Actions" or "PPL Actions"). Compl. ¶ 46. To date, all of the claims listed above, other than the Class Actions, have been settled without triggering Sammons' $5 million retention.[3] Hr'g Tr. at 10, 35.[4] Though the fourteen Submitted Matters were submitted to Federal for notice purposes, Defendants have sought coverage under the Excess Policy for only the Class Actions. Hr'g Tr. at 10.

Defendants' attempts to receive reimbursement from Federal for litigation costs associated with the Class Actions have given rise to the present declaratory judgment action. In the first of the three Class Actions, *In re Midland National Life Insurance Co. Annuity Sales Practices Litigation* ("*MDL*"),[5] the named plaintiffs allege that Midland and its agents used manipulative and coercive tactics to defraud or mislead seniors. The alleged tactics include the production of deceptive marketing materials, a failure to properly train sale representatives, and the implicit encouragement of "churning."[6] RJN Ex. 2 at 108–172. The *MDL* plaintiffs seek relief for various federal and state causes of action and request injunctive relief, as well as compensatory, punitive, statutory, and treble damages. *Id.* at 82. The *MDL* action is currently pending in the Central District of California, discovery has commenced, including appointment of a neutral expert witness by the court, and Midland has filed a motion for summary judgment. *Id.*; Hr'g Tr. at 34; *see MDL* Docket, Clerk's Nos. 3, 199. The parties are engaged in continuing settlement negotiations, but no settlement has been reached. Compl. ¶ 69; Hr'g Tr. at 34.

The second class action, *Peterson v. North American Co. for Life and Health*

---

3. The retention is set forth in the Primary Policy and is the amount below which the Insurers have no obligation to pay "Loss" on behalf of Sammons. *See* Compl. Ex. A at 12. ("With respect to each Claim under the Policy, the Insurer shall be obligated to pay Loss, Including Defense Expenses, only in excess of the retention [of $5 million]. The Insurer will have no obligation whatsoever, either to the Insureds or to any other person or entity, to pay all or any portion of any retention amount on behalf of any Insured, . . . .").

4. All transcript references refer to the unedited RealTime transcript provided to the Court by the court reporter.

5. The *MDL* action is, in fact, two separately filed actions consolidated in California for pre-trial purposes. *In re Midland National Life Ins. Co. Annuity Sales Practices Litigation*, 484 F.Supp.2d 1355, 1355 (J.P.M.L. 2007). The *MDL* action consists of *Migliaccio v. Midland National Life Insurance Co.*, Case No. 2:06–cv–1007, originally filed in California Superior Court, now pending in the Central District of California, and *Bendzak v. Midland National Life Insurance Co.*, Case No. 4:05–cv–649, originally filed in the Southern District of Iowa. *Id.*; RJN Ex. 2(C)-(D).

6. " 'Churning' describes the use of deceptive practices to deplete the accumulated cash value from an existing life insurance policy or annuity . . . and to apply that money to the purchase of a new . . . deferred annuity." RJN Ex. 2 at 68.

*Insurance,* alleges NACOLAH used deceptive contractual and marketing language in its sales of deferred annuities to seniors. *Id.* at 174–194. The *Peterson* plaintiffs bring only state causes of action against NACOLAH, including fraud and breach of the implied covenant of good faith and fair dealing, and they seek compensatory and punitive damages. *Id.* The *Peterson* action is pending in the County of Los Angeles Superior Court of California. *Id.* Discovery has commenced, and the parties have participated in mediation talks, but no settlement has been reached. Compl. ¶ 70; *see* Hr'g Tr. at 34.

The third class action, *Yokoyama v. Midland National Life Insurance Co.,* alleges Midland used deceptive and misleading sales practices in marketing deferred annuities to seniors and seeks injunctive relief, as well as compensatory and punitive damages for violations of state law. RJN Ex. 2 at 174–194. Class certification was denied in the *Yokoyama* action by the District Court of Hawaii, and an appeal of that denial is pending before the Ninth Circuit Court of Appeals. *Yokoyama v. Midland Nat'l Life Ins. Co.,* 243 F.R.D. 400 (D.Haw.2007); Hr'g Tr. at 34.

Defendants have submitted invoices related to the Class Actions to Federal and have demanded that Federal advance approximately $1 million, on the basis that invoiced costs of approximately $16 million have been accrued by Defendants in defending the Class Actions, satisfying the $5 million retention and the Primary Policy's $10 million limit.[7] Compl. ¶ 74; Hr'g Tr. at 13. Federal and Defendants, through a series of letters, have disputed whether Indian Harbor's payment under the Primary Policy triggered Federal's obligation to advance defense costs in any of the Submitted Matters. Compl. ¶¶ 75–76. In these letters, Federal expressed its reservations of rights under the Primary Policy and Excess Policy for the Submitted Matters. *Id.* ¶ 62. Defendants, in a series of responding letters, disputed Federal's reservations of rights. *Id.* ¶ 63. The parties specifically contested whether the Class Actions should be treated as separate "claims" under the Excess Policy or should be aggregated with the Individual Actions, AG Action, and PPL Actions. *Id.* ¶¶ 64–65. On July 21, 2008, Federal filed this action for a declaratory judgment that it has neither the duty to advance defense costs to, nor to indemnify Defendants in, the Class Actions, Individual Actions, AG Action, and PPL Actions. *See id.* ¶¶ 46, 79–129.

On July 22, 2008, the day after this action was filed, Defendants filed a similar action in California ("California Action") seeking a contrary declaratory judgment, at least with respect to Federal's obligation to advance defense costs in the Class Actions.[8] RJN Ex. 2 at 1–2. How-

---

7. At the time Federal filed this action, it contended that it had not received confirmation from Defendants that Indian Harbor had advanced any costs under the Primary Policy. Compl. ¶ 73. However, it appears that the parties no longer dispute that Indian Harbor has advanced defense costs to Defendants under the Primary Policy totaling $10 million. Defs.' Br. in Supp. of Mot. at 1; Hr'g Tr. at 10, 15, 62.

8. Defendants argue that the California Action sought declaratory judgment concerning only Federal's obligation to advance defense costs,

not to indemnify. However, Defendants' complaint in the California Action, in seeking declaratory judgment, included the following two statements which contradict their argument here:

(1) Sammons has tendered and, without waiving prior tenders, hereby further tenders the Underlying Claim to Federal for reimbursement of defense costs *and indemnification;* and

(2) Wherefore, Sammons prays that this Court enter judgment on its complaint ... that this court determine and declare ... [t]hat Federal is obligated to pay, without

ever, the District Court for the Central District of California, applying the "First to File Rule," has since dismissed the California Action. Pl.'s Supp. RJN Ex. 18 at 1; Defs.' Reply at 1. As an alternative basis for the California Action's dismissal, the court found that the California Action should be transferred to the Southern District of Iowa, pursuant to 28 U.S.C. § 1404(a). Pl.'s Supp. RJN Ex. 18 at 1.

## II. LAW AND ANALYSIS

Federal's Complaint sets forth its arguments against its duty to advance defense costs and indemnify Defendants in ten Counts, which are most easily addressed once divided into four groups. First, in Counts I, II, and III, Federal contends that there is no coverage or duty to indemnify under the Excess Policy for any of the seventeen claims it has identified that allege torts related to the sale of Defendants' annuities to seniors. Federal argues that the Submitted Matters and the PPL Actions are factually related or substantially similar such that they form a single claim under the Excess Policy. Based upon Section IV(A)(4) in the Primary Policy (Count I); Section 7 of the Excess Policy (Count II); and Endorsement Number 3 of the Excess Policy (Count III), Federal argues that under the Excess Policy, this single claim arose at the date of the earliest constituent action. Because the PPL Actions arose prior to the coverage period, that is, before November 7, 2004, all of the seventeen claims fall outside the Excess Policy's coverage. Compl. ¶¶ 79–91. Second, Federal argues that the Excess Policy provides no coverage for, or duty to indemnify, Defendants for the damages sought by the Class Ac-

tion plaintiffs because such damages do not constitute "Loss" under the Excess Policy (Count IV). *Id.* ¶¶ 92–100. Third, Federal seeks to establish that there is no duty to indemnify under the following exclusions: (1) the Fraudulent Act exclusion (Count V); (2) the Intentional Act exclusion (Count VI); (3) the Profit or Advantage exclusion (Count VII); (4) and the Representation of Performance or Value exclusion (Count VIII). *Id.* ¶¶ 101–120. Finally, in Counts IX and X, Federal seeks declaratory judgment that it has no duty to advance defense costs. Federal broadly states in Count IX that there is no duty to advance defense costs because there is no coverage under the Excess Policy. *Id.* ¶¶ 121–23; Hr'g Tr. at 56–57. More specifically, Federal claims, relying on Section IV(C)(4), that it has no duty to review and/or advance defense costs until the Primary Policy is depleted and Defendants execute a satisfactory written guarantee (Count X). Compl. ¶¶ 124–29.

In response to Federal's declaratory judgment action, Defendants first argue that the action fails to present an actual controversy. Defendants, therefore, move to dismiss each of the ten counts set forth in the Complaint. Defs.' Mot. at 1. Alternatively, Defendants argue that the interest of justice requires this Court to stay the action or to transfer it to California. *Id.* The Court will address each argument in turn.

### A. *Jurisdiction Under the Declaratory Judgment Act*

Federal brings this action pursuant to the Declaratory Judgment Act, which provides in pertinent part:

---

reservation, ... any damages, judgments, awards or settlements in connection with the Underlying Claim.

RJN Ex. 2 at 10–11 (emphasis added). At the hearing, Defendants argued that no specific count in the California complaint sought a

declaratory judgment regarding Federal's duty to indemnify and that the indemnity language in the complaint was a "placeholder" to maintain the court's jurisdiction over any later indemnity dispute. Hr'g Tr. at 74.

In a case of *actual controversy* within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added). Defendants claim that the Complaint fails to allege an "actual controversy." [9] *See generally* Defs.' Br. in Supp. of Mot. More specifically, Defendants claim that the Class Actions must be resolved before the dispute over Federal's indemnity obligation becomes an "actual controversy." *Id.*

 Because declaratory judgment is a procedural remedy set forth by federal statute, federal law guides the Court's jurisdictional analysis.[10] *Modern Equip. Co. v. Cont'l W. Ins. Co.*, 146 F.Supp.2d 987, 990 (S.D.Iowa 2001) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 680, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Fed. Kemper Ins. Co. v. Rauscher*, 807 F.2d 345, 352 (3d Cir.1986); *Icarom v. Howard County, Maryland*, 904 F.Supp. 454, 458 (D.Md.1995); *Standard Fire Ins. Co. v. Sassin*, 894 F.Supp. 1023, 1025–26 (N.D.Tex.1995); *Hunt v. State Farm Mut. Auto. Ins. Co.*, 655 F.Supp. 284, 286 (D.Nev.1987)). In the context of a declaratory judgment action, an "actual controversy" exists if, "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (internal citations omitted).

 In the present case it is clear that both a "substantial controversy" exists and that it is "between parties having adverse legal interests." The controversies concerning Federal's obligations to advance defense costs and to indemnify Defendants pertain to Federal's duty to provide millions of dollars of insurance coverage to

9. Defendants caption their motion to dismiss as arising under Federal Rule of Civil Procedure 12(b)(6). However, the "controversy" requirement of § 2201 is nothing more than a restatement of the Article III "controversy" requirement. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937) ("The Declaratory Judgment Act of 1934, in its limitation to 'cases of actual controversy,' manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense."); *County of Mille Lacs v. Benjamin*, 361 F.3d 460, 463 (8th Cir.2004) ("The controversy requirement of the Declaratory Judgment Act is synonymous with that of Article III of the Constitution."). As such, the issue of whether an "actual controversy" is present goes to the Court's subject matter jurisdiction and, accordingly, is properly considered as a motion to dismiss under Rule 12(b)(1).

10. Defendants cite decisions from the Iowa Supreme Court and the Northern District of Iowa for the broad proposition that "Iowa state . . . courts recognize and apply the general principle that decisions concerning indemnity are not ripe until the underlying liability has been established." *See* Defs.' Br. in Supp. of Mot. at 5 (citing *W. Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.*, 503 N.W.2d 596 (Iowa 1993) and *Smithson v. Wolfe*, No. C94–1015, 1999 WL 33656866 (N.D.Iowa July 19, 1999)). The Court notes that not only is state law inapplicable to the question of the justiciability of an action brought under the Declaratory Judgment Act, but also that, even if state law were to apply, it is far from clear that Iowa law is the state law that would be applicable. Indeed, there is no evidence in the record that Iowa is the place where the contracts were formed, negotiated, or performed, and neither Federal nor Sammons are incorporated in Iowa. *See* Restatement (Second) Conflicts of Laws § 188(2).

Defendants, a substantial amount by any accounting. Further, as is apparent from the extensive correspondence and court filings by both Defendants and Federal, including a declaratory action filed by each party suing the other, each presenting opposing positions of Federal's duty to provide payment to Defendants, this controversy is "between parties having adverse legal interests."

Next, the Court must consider the closer question of whether the disputes over the obligations to advance defense costs and to indemnify are "sufficient[ly] immedia[te] and real[ ] to warrant the issuance of a declaratory judgment." *Id.* Defendants vehemently contend that Federal's indemnification obligation is "not ripe" and "premature" because the standard for justiciability cannot be met where, as here, a declaratory judgment action concerns indemnity obligations that are intertwined with unresolved factual issues in pending, underlying litigation. Defs.' Br. in Supp. of Mot. at 5. The Court cannot agree with this proposition since both the Supreme Court and the Eighth Circuit have held that a declaratory judgment action may be justiciable despite the presence of unresolved facts or the pendency of underlying litigation.

In *Aetna Life Insurance Co. of Hartford, Conn. v. Haworth*, the Supreme Court found that the declaratory judgment action seeking resolution of an insured's coverage was justiciable and specifically rejected the contention that a declaratory judgment action would be "withdraw[n] ... from judicial cognizance" merely because it turns on questions of fact. 300 U.S. 227, 243, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The Court noted that the determination of facts is the "everyday practice" and "province of the courts." *Id.* at 242, 57 S.Ct. 461. Likewise, in *Maryland Casualty*, the Supreme Court concluded that an actual controversy existed between the

insurer and the parties to an underlying state action when the insurer sought a declaratory judgment that it had no duty to defend or indemnify its insured in an underlying action. 312 U.S. at 273–74, 61 S.Ct. 510. Though the Court noted that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree," the Court found it clear that a justiciable controversy was presented by the insurance dispute, which was inextricably intertwined with a tort action pending in state court. *Id.* at 273, 61 S.Ct. 510.

Additionally, the Eighth Circuit has found declaratory judgment actions justiciable even though facts remain unresolved in underlying, pending litigation so long as the dispute presented is real and immediate, rather than abstract. In *Aetna Casualty & Surety Co. v. General Dynamics Corp.*, insurer Aetna sought a declaratory judgment that it had no duty to defend or indemnify the insured in claims brought against the insured for alleged environmental pollution. 968 F.2d 707, 709 (8th Cir.1992). The Eighth Circuit held that, even where no suits had yet been filed nor any settlements reached, "since [the insured] had made a clear demand for payment of defense and indemnity costs ... and because [the insurer] disputed those demands, there [was] a live justiciable controversy between the parties sufficient to invoke jurisdiction of the district court." 968 F.2d at 711 (citing *Aetna Life Ins.*, 300 U.S. at 227, 57 S.Ct. 461). Similarly, in *Capitol Indemnity Corp. v. Miles*, the Eighth Circuit held that when "[t]he lines are drawn [and] the parties are at odds, the dispute is real." 978 F.2d 437, 438 (8th Cir.1992). In *Capitol Indemnity*, the insurer sought a declaratory judgment that it had no duty to indemnify its insured in a claim arising from alleged car damage. *Id.* The Court noted that when "insurers [ ] deny that

coverage exists under their policy for liabilities of their insureds that are contingent or unadjudicated ... it is most common for the insurer to bring an action for a declaratory judgment that it will have no duty to indemnify." *Id.* In both *Aetna Casualty* and *Capitol Indemnity,* the insureds sought to resolve a coverage dispute arising from underlying litigation in which various factual determinations were unresolved, yet the courts found it unnecessary to address the effect of these unresolved factual issues before concluding that the disputes presented justiciable controversies. This very lack of discussion signals that the need to resolve factual issues in underlying litigation does not present a bar to the justiciability of a declaratory judgment action between an insurer and its insured to establish the insurer's duty to provide coverage in the underlying litigation. *Aetna Cas.,* 968 F.2d at 711; *Capitol Indem. Corp.,* 978 F.2d at 438; *see also Gopher Oil Co. v. Bunker,* 84 F.3d 1047, 1050 (8th Cir.1996) (concluding that a contractual indemnity claim was ripe when an underlying action for CERCLA liability had been initiated).

Given these precedential cases, it is clear that the dispute surrounding Federal's obligation to advance defense costs is both real and immediate, despite Defendants' equivocations that there is only a "potential current dispute" regarding the duty to advance defense costs and that it is a "closer call" as to whether there is an actual controversy surrounding the duty to advance defense costs. Hr'g Tr. at 15, 29. Given that the Defendants' defense of the Class Actions is ongoing, Defendants have submitted invoices and requested payment of defense costs under the Excess Policy, Federal and Defendants are actively negotiating the terms of the written guarantee for the purpose of advancing defense costs, and Defendants affirmatively sought to have the duty to advance defense costs adjudicated by filing a declaratory judg-

ment action, the Court concludes that the controversy over the duty to advance defense costs is "sufficient[ly] immedia[te] and real[ ] to warrant the issuance of a declaratory judgment."

Likewise, given the Eighth Circuits holding's in *Aetna Casualty* and *Capitol Indemnity,* the Court concludes that the question of Federal's duty to indemnify is both immediate and real. *Aetna Cas.,* 968 F.2d at 711; *Capitol Indem. Corp.,* 978 F.2d at 438. Like the parties in *Aetna Casualty,* Defendants have applied to Federal for coverage based on their defense of the Class Actions, and Federal has contested that coverage. In addition, the Court believes the potential for settlement increases the immediacy of the dispute. Settlement negotiations have occurred in at least two of the three Class Actions, and settlement in the Class Actions appears a likely eventuality since all other Submitted Matters have settled out of court. The Excess Policy explicitly obligates Federal to pay "Loss" from settlement, as well as from adjudications, thus, a settlement has the potential to trigger Federal's duty to indemnify. But without a determination of Federal's duty to indemnify Defendants, it remains uncertain whether Federal or Defendants will bear the ultimate financial liability for any settlement costs. *See AC & S, Inc. v. Aetna Cas. & Sur. Co.,* 666 F.2d 819, 823 (3d Cir.1981) (discussing the overwhelming number of disputes that are resolved by settlement and the need to resolve coverage disputes in order to discern whether the insurer or the insured bears "the onus and risks of settlement"); *see also* Bradley S. Wolff, Stephen L. Cotter & Stephen M. Schatz, *Insurance,* 59 Mercer L. Rev. 195, 203 (2007) (noting that refusal to rule on a insurer's duty to indemnify may place insurers in the difficult position of being unable to determine whether coverage exists and may discourage settlement of underlying lawsuits). This uncertainty has. contributed to the

immediacy and reality of the controversy between Federal and Defendants, evidenced by the parties' references to uncertainty regarding their respective roles in the settlement talks. *See* Compl. §§ 67–71 (describing correspondence between Federal and Sammons regarding Federal's role in the *MDL* settlement negotiations and the *Peterson* mediation); Defs.' Reply at 9–10. Finally, the Court notes that, despite Defendants' protestations otherwise, the California Action Defendants initiated against Federal sought to establish not only Federal's duty to advance defense costs, but also encompassed Federal's duty to indemnify. Because the lines between the parties are clearly drawn and there is a very real and immediate possibility of settlement, the Court concludes that the dispute over Federal's duty to indemnify is both real and sufficiently immediate to satisfy the actual controversy requirement.[11]

### B. *Discretion to Stay the Declaratory Judgment Action*

■ Defendants argue that even if the Court finds there is an actual controversy, it should stay these proceedings pending resolution of the Class Actions. It is well established that "district courts possess discretion in determining whether and when to entertain an action under the De-

claratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (reaffirming its holding in *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494–95, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942)). The Supreme Court noted in *Wilton* that it had "repeatedly characterized the Declaratory Judgment Act as 'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Id.* at 287, 115 S.Ct. 2137 (citations omitted). "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288, 115 S.Ct. 2137.

■ The degree of discretion bestowed upon the district court to stay or dismiss a declaratory judgment action, however, varies depending on the context surrounding the dispute. Where a declaratory judgment action has some relation to an underlying state action but is not "parallel" to it, "the considerations of practicality and wise judicial administration that allow a district court greater discretion under *Wilton* are diminished."[12] *Scotts-*

---

**11.** Defendants argue that Counts V through VII are not justiciable because the contract language of the Fraudulent Act, Intentional Act, and Profit or Advantage exclusions require a final adjudication, noting that the contract language states: "the EXCLUSION shall not apply ... unless it is established ... by a final adjudication in the underlying action or in a separate action or proceeding." Defs.' Br. in Supp. of Mot. at 6. A plain reading of the language compels a conclusion that the adjudicatory requirement will be satisfied by a separate action or proceeding, including a declaratory judgment. Presumably, the final phrase, "or in a separate action or proceeding," is present for precisely this eventuality, given the frequency with which insurers bring declaratory judgment actions.

*See Modern Equip.*, 146 F.Supp.2d at 991 (observing that "[c]ourts have consistently allowed insurers to sue insureds—prior to resolution of the underlying actions—in order to obtain a declaration of coverage"); *see also Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 911 (7th Cir.2001) (discussing the likelihood of settlement and the desirability of establishing coverage liability based on such exclusions in separate actions or proceedings). Thus, the Court concludes that the contract language itself does not render a declaratory judgment to establish coverage nonjusticiable.

**12.** Suits are parallel if substantially the same parties litigate substantially the same issues in different forums. *Scottsdale*, 426 F.3d at 997

dale Ins. Co. v. Detco Indus., Inc., 426 F.3d 994, 996 (8th Cir.2005) (citing Wilton, 515 U.S. at 290, 115 S.Ct. 2137). The Eighth Circuit has adopted a six-factor test developed by the Fourth Circuit to guide district courts in determining whether to exercise jurisdiction over a declaratory judgment action related, but not parallel, to an action pending in state court. Id. at 998–99 (citing Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co., 139 F.3d 419, 422 (4th Cir.1998)). The Scottsdale factors are as follows:

(1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue;

(2) whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the federal proceeding;

(3) the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in state courts;

(4) whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending;

(5) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and

(6) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable.[13]

Id. (quotations omitted). A stay of the declaratory judgment action is within the district court's discretion so long as the factors weigh in favor of denying or postponing declaratory relief. See id.

As noted, the six Scottsdale factors were developed by the Fourth Circuit through a line of cases described in Ind–Com, 139 F.3d at 422–23 (citing Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371 (4th Cir.1994); Mitcheson v. Harris, 955 F.2d 235 (4th Cir.1992); Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321 (4th Cir.1937)). As well as describing the derivation of the six factors, the Fourth Circuit noted that the factors reflect considerations of efficiency, procedural fencing, federalism, and comity. 139 F.3d at 423; see also Sherwin–

(quotations and citations omitted). Here, the insurer of the Defendants, Federal, is not a party to any of the Submitted Matters or PPL Actions, and the issue presented in this declaratory judgment action is whether there is insurance coverage of the Class Actions, an issue which will not be litigated in the underlying tort-based Class Actions.

13. Defendants rely heavily on the analysis employed by the Northern District of Iowa in Wells Dairy, Inc. v. Travelers Indem. Co. of Ill., a decision issued before the Eighth Circuit adopted the Scottsdale analysis. 241 F.Supp.2d 945 (N.D.Iowa 2003). The Wells Dairy Court granted a stay in that insurance coverage dispute based primarily on the concerns that allowing the declaratory judgment action to proceed would create a risk of prejudice from inconsistent factual determinations and might undermine the insured's defenses. Wells Dairy, 241 F.Supp.2d at 977. To the extent that the Scottsdale factors weigh such burdens on the parties, they are considered within the sixth factor, which disfavors the use of declaratory judgment as a device for procedural fencing. Scottsdale, however, limits the breadth of the sixth factor to situations where the same parties may later attempt to litigate the same issues, leading to preclusion by res judicata. 426 F.3d at 1000. Indeed, Scottsdale explicitly states that the sixth factor does not encompass the concern that the parties may later use the declaratory judgment for offensive or defensive collateral estoppel. Id.

*Williams Co. v. Holmes County*, 343 F.3d 383, 390–93 (5th Cir.2003) (noting the similarity between each Circuit Court of Appeals' version of the *Scottsdale* factors, including underlying policy concerns of proper allocation of decision-making between state and federal courts, fairness, and efficiency). Here, where one action is pending before a state court, the *Peterson* action, and two are pending before federal courts, the *MDL* and *Yokoyama* actions, the Court first considers the fairness, efficiency, federalism, and comity concerns raised by the pending state proceeding. However, the fairness and efficiency concerns raised by the pendency of related federal proceedings will also affect the practicality and wisdom of adjudicating the declaratory judgment action. Therefore, the Court will take note of any over-arching fairness and efficiency concerns raised by the two pending federal proceedings.

■ As described above, the several Counts set forth in Federal's Complaint require inquiry into four distinct coverage issues. First, the Court will address whether Federal's claim that it has no duty to advance defense costs to Defendants should be stayed. Next, the Court will consider whether adjudication should be stayed on the basis of Federal's arguments that its has no duty to indemnify Defendants because: (a) the Fraudulent Act, Intentional Act, Profit or Advantage, and Representation of Performance or Value exclusions negate Federal's duty to indemnify Defendants; (b) there is no coverage under the Excess Policy because the claims in the Submitted Matters are related to or substantially similar to the claims in the PPL Actions; and (c) the damages sought by the Class Action plaintiffs do not constitute a "Loss" under the Excess Policy. The Court addresses each argument in turn, summarizing the legal and factual inquiries required to address these coverage issues and, then, applying the *Scottsdale* factors to consider whether the de-

claratory judgment action, in part or as a whole, should be stayed.

### 1. *Duty to advance defense costs (Counts IX and X).*

In Counts XI and X, Federal asks the Court to address whether Federal has a duty to advance defense costs to Defendants, in general, and, specifically what Defendants must supply to Federal as a prerequisite to receiving an advance of defense costs. The question of how to treat an insurer's duty to advance defense costs is one which few courts have had occasion to address. Where the occasion has arisen, state courts generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend, concluding that the duty arises if the allegations in the complaint could, if proven, give rise to a duty to indemnify. *See Acacia Research Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 05–501, 2008 WL 4179206, at *11 (C.D.Cal. Feb. 8, 2008) ("[A]s with a duty to defend, Defendant's duty to advance defense costs arose on tender of a potentially covered claim."); *Hurley v. Columbia Cas. Co.*, 976 F.Supp. 268, 275 (D.Del.1997) ("[T]here does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense."); *Am. Chem. Soc. v. Leadscope, Inc.*, No. 04AP–305, 2005 WL 1220746, at *4–8 (Ohio Ct.App. May 24, 2005) (concluding that a "pleadings test" has been consistently applied in cases seeking to establish an insurer's duty to defend and duty to advance defense costs); *but see In re Kenai Corp.*, 136 B.R. 59, 64 (S.D.N.Y.1992) ("Unlike duty to defend policies, which require the insurer to defend claims even if they are only arguably entitled to coverage, policies requiring the insurer to reimburse damages and defense costs related to wrongful acts entitle

the insured to costs only when the underlying claims are covered by the policy."). Furthermore, it is likely that the insurer will be required to advance costs to defend against all claims in the complaint unless it can show unequivocally that each allegation in the underlying complaint is not covered by the policy. *Am. Chem. Soc.*, 2005 WL 1220746, at *4–8 (concluding, after a review of other similar decisions, that the "one claim-all claims principle" should apply to cases involving the duty to advance defense costs); *see also HLTH Corp. v. Agric. Excess and Surplus Ins. Co.*, No. 07C–09–102, 2008 WL 3413327, at *13 (Del.Super.Ct. July 31, 2008) (requiring an insurer to advance defense costs when it could not demonstrate that all of the allegations in the indictment fell outside of the coverage periods). Thus, when considering Federal's duty to advance Defendant's defense costs in the Class Actions, the Court's determination of Federal's duty is most likely to be based solely on an evaluation of the Policy language and the allegations set forth in the Class Action complaints.

Turning to the *Scottsdale* factors, the Court considers the applicability of each of the six factors sequentially. The first *Scottsdale* factor asks "whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue," and the second "whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the federal proceeding." *Scottsdale*, 426 F.3d at 998–99. Both of these inquiries are driven by concerns that "an action should not be used 'to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted.'" *Ind–Com*, 139 F.3d at 422 (citing *Quarles*, 92 F.2d at 325). Under the first factor, the Court concludes that a declaratory judgment on both

Counts IX and X would clarify and settle the issue of Federal's duty to advance defense costs, and thus weighs in favor of allowing the action to proceed. The second *Scottsdale* factor is closely tied to the first factor. When the Court resolves whether Federal has an obligation to advance defense costs, it will afford relief from the uncertainty, insecurity, and controversy giving rise to the portion of these proceedings, at least regarding Federal's duty to advance defense costs. Thus, both the first and the second *Scottsdale* factors weigh against granting a stay on the issue of Federal's duty to advance defense costs.

The third *Scottsdale* factor weighs "the strength of the state's interest in having the issues raised in the federal declaratory judgment action decided in state courts." *Scottsdale*, 426 F.3d at 998–99. This factor acknowledges the interest a state has in developing its own legal principles. *See Penn–Am. Ins. Co. v. Coffey*, 368 F.3d 409, 414 (4th Cir.2004) (noting a state will have "a strong interest in protecting its jurisprudence and an interest in deciding cases calling for application of its own law."). Notably, here, the only Class Action in state court is the *Peterson* action, which is pending in California state court. However, the State of California lacks a significant relationship with the formation and performance of the Excess Policy, and neither of the parties to the Excess Policy are incorporated or have their principal places of business in California. Thus, it appears unlikely that California state law will govern the interpretation of the contract. *See* Restatement (Second) Conflicts of Laws § 188(1) ("The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties...."). Further, the Court cannot foresee that the issue of Federal's duty to advance defense

costs will be raised in the state court action since that action rests on tort and statutory claims against NACOLAH, and Federal is not a party to the action. *See Penn–Am.*, 368 F.3d at 414 (noting that where the contractual coverage issue will not be decided by the state cases and the insurer is not party to the state case, deference to the state court case will not advance the state's interest significantly). Thus, the third factor does not support a stay of Counts IX and X.

The fourth *Scottsdale* factor asks "whether the issues raised in the federal action can more efficiently be resolved in the court in which the state action is pending." *Scottsdale*, 426 F.3d at 998. As noted above, the issues raised in Counts XI and X, the duty to advance defense costs, are not ones that will be raised in the *Peterson* action, which is the only matter proceeding in state court, nor in the *MDL* action or *Yokoyama* action, which are both proceeding in federal court. Because this Court is the only court in which the insurance coverage issues are pending and there is no indication that Federal's duty to advance defense costs will be raised in any of the Class Actions, it is most efficient to address that question here. Thus, the fourth factor does not support a stay of Counts IX and X.

The fifth *Scottsdale* factor asks "whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law." *Id.* This factor is driven by the overarching principles of federalism and comity that militate against permitting a federal action to go forward that "would result in unnecessary 'entanglements' between the federal and state court systems because of 'overlapping issues of facts or law.'" *Id.* (citing *Ind–Com*, 139 F.3d at 422). By avoiding "entanglements," such as overlapping issues raised both in a federal declaratory judgment and a state court proceeding, the federal courts seek to minimize the inherent friction present in our system of judicial federalism. *See Mitcheson*, 955 F.2d at 237–40 ("A system of judicial federalism has enough inherent friction without the added aggravation of unnecessary federal declarations on questions [that will be addressed in the pending state action]."). Here, Federal's duty to advance defense costs is most likely to be resolved by an examination of the claims laid forth in the pleadings. Thus, the Court will not be required to become entangled in the state court proceeding through factual and legal issues subject to adjudication in the *Peterson* action. *See Penn–Am.*, 368 F.3d at 412–13 (finding no entanglement was necessary to resolve whether the insurer had a duty to defend). The Court does not foresee that the adjudication of Federal's duty to advance defense costs will result in unnecessary entanglements of the federal and the state court system, and, therefore, the fifth *Scottsdale* factor does not suggest that a stay of Counts IX and X is necessary.

Finally, the sixth *Scottsdale* factor asks "whether the declaratory judgment action is being used merely as a device for procedural fencing—that is to provide another forum in a race for res judicata or to achieve a federal hearing in a case otherwise not removable." *Scottsdale*, 426 F.3d at 998. Here, there is no indication that the declaratory judgment action is being used as a device for procedural fencing, despite Defendants' contention that Federal filed the declaratory judgment action in Iowa in an attempt at forum-shopping. The sixth *Scottsdale* factor, therefore, also weighs against a stay. Because none of the six *Scottsdale* factors support a stay of declaratory judgment action on Federal's obligation to advance defense costs, the

Court denies Defendants' motion to stay Counts IX and X.

## 2. *Duty to indemnify.*

■ Unlike the duty to advance costs, the duty to indemnify an insured is often based on the actual facts which establish liability in the underlying case. *E.g., Allstate Ins. Co. v. Westom,* No. 07–1265, 2008 WL 441726, at * 2 (D.Or. Feb. 14, 2008) ("[T]he duty to indemnify is established by proof of actual facts demonstrating a right to coverage." (citation and quotations omitted)); *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 821 (Tex. 1997) ("The duty to indemnify is triggered by the actual facts establishing liability in the underlying suit."). In its Complaint, Federal sets forth eight Counts, each based on a different contractual provision, which it believes relieves it of its duty to indemnify Defendants in all of the Submitted Matters, including the Class Actions. Four of these contractual provisions are contractual exclusions that specifically deny coverage for acts which fall under the Fraudulent Act, Intentional Act, Profit or Advantage, or Representation of Performance or Value exclusions. Three of these contractual provisions specify that there is no coverage under the Excess Policy where the claims are related or substantially similar to claims that were initiated before the coverage period. Finally, Federal notes the definition of "Loss" under the Excess Policy and seeks to establish that the damages sought by the Class Action plaintiffs would not constitute such a "Loss." Each of these groupings will require different inquiries and has varying implications for several of the *Scottsdale* factors, as set forth below.

### a. *Applicability of the exclusions (Counts V through VIII).*

■ In Counts V through VIII, Federal seeks to establish that there is no coverage and/or duty to indemnify Defendants be-cause coverage is barred under the Fraudulent Act, Intentional Act, Profit or Advantage, and Representation of Performance or Value exclusions. Each of the underlying Class Actions allege fraud and misrepresentation for the purpose of profit, allegations which potentially trigger each of these exclusions. Notably, the first three of the relevant contractual provisions, which Federal relies upon in Counts V through VII, state explicitly that the exclusion must be established by a final adjudication "that the Insured participated in or acquiesced in the dishonest, fraudulent or criminal act or omission, the willful or intentional violation, or the gaining of profit, remuneration or advantage." Compl. Ex. A at 26. In order for this Court to rule on the applicability of each of these exclusions, the Court would be required to make factual determinations as to the conduct alleged in the Class Actions. The Representation of Performance or Value exclusion at issue in Count VIII, on the other hand, does not contain the same adjudication requirement in the exclusions of the previous three Counts. Nevertheless, the similarities between the fact-based nature of this exclusion and those set forth in Count V through VII suggest that the applicability of the Representation of Performance or Value exclusion may require a final adjudication in the underlying proceedings. *See Allmerica Financial Corp. v. Certain Underwriters at Lloyd's, London,* 449 Mass. 621, 871 N.E.2d 418, 432–33 (2007) (requiring factual or legal conclusions about the validity of the allegations in the complaint before deciding whether an exclusion for "actual or alleged" promises of performance barred coverage). Additionally, the Court notes that any factual inquiry into the representations made during the sale of annuities will overlap with the inquiries required in examining the applicability of the Fraudulent Act, Intentional Act, Profit or Advantage exclusions.

When the *Scottsdale* factors are applied to Counts V through VIII, the first and second factors, with their concerns for resolution and clarification, weigh against a stay, since a decision that one of the exclusions apply would resolve the uncertainty surrounding Federal's duty to indemnify and settle the legal relations between Federal and Defendants. However, the potential for resolution is tempered by the fact that Counts V through VIII include only four of the eight potential Counts by which the Court could find that Federal has no duty to indemnify Defendants. If none of these Counts were to absolve Federal of its duty to indemnify Defendants, and other Counts had been stayed, the adjudication of these Counts would not have substantially furthered the interests of resolution and clarification. The Court, accordingly, reduces the weight it places on the first and second factors, both in regard to these Counts, and in each of its subsequent examinations of the first and second *Scottsdale* factors. Following discussion of all of the duty to indemnify Counts, the Court will consider how any potential for piecemeal litigation affects its decision to grant or deny a stay on each of the duty to indemnify Counts.

The third *Scottsdale* factor, which requires consideration of the state court's interest in the adjudication, leans towards a stay. If the Court were to proceed with an inquiry into the applicability of each of the exceptions, it would be required to determine whether Defendants, in fact, violated any one of several California laws pleaded in the *Peterson* complaint. The California court before which the *Peterson* action is pending certainly has an interest in interpreting its own laws and determining whether NACOLAH violated California laws when selling annuities to California citizens.

The fourth factor, which considers efficiency concerns, also weigh toward a stay of the declaratory judgment action on these Counts. Each of the Class Actions have been underway for several years and, in at least one case, a consolidated motion for summary judgment is under consideration. In another of the Class Actions, class certification has been considered, denied, and an appeal is pending before the Court of Appeals. Given that each of the courts in which the Class Actions are pending are already familiar with the facts and allegations presented in each of the Class Actions, and also considering the additional time which would be required to engage in an evaluation of the cumulative cases, the Court presumes that the courts currently considering the Class Actions will have the opportunity to resolve the factual and legal issues surrounding Defendants' conduct more quickly and efficiently than this Court could.

The fifth factor, which seeks to avoid entanglements between the state and federal judicial systems, also supports a stay. Counts V through VIII rest upon the very facts and legal issues which the Class Action plaintiffs seek to establish in their suits against Defendants. For example, the *Peterson* complaint alleges that two agents who sold NACOLAH annuities to seniors "violated the [California Unfair Competition Law] by, inter alia: . . . selling annuities through the use of various misrepresentations including that annuities are completely safe, and without consequences of surrender charges and interest adjustments." RJN Ex. 2 at 184. In making this pleading, the *Peterson* plaintiffs have alleged a claim which, if proven, might trigger the Fraudulent Act, Intentional Act, Profit or Advantage exclusions, as well as the Representation of Performance or Value exclusion. The overlapping issues of fact and law presented in Counts V through VIII and the *Peterson* action would clearly entangle this Court with the California state court system. These en-

tanglements can be avoided by staying this Court's consideration of the substance of these Counts, pending resolution of the *Peterson* action. Accordingly, the fifth *Scottsdale* factor weighs strongly toward granting a stay on these Counts. *See, e.g., Acuity v. N. Cent. Video, LLLP,* 468 F.Supp.2d 1071, 1077 (D.N.D.2006) ("[I]n applying factors similar to those set forth [in *Scottsdale* ], a number of federal courts have expressed a reluctance for deciding in a declaratory action disputed facts that are material to resolution of the underlying state-court action.") (citing *Penn–Am.,* 368 F.3d at 413–14; *Nationwide Ins. v. Zavalis,* 52 F.3d 689, 692–697 (7th Cir.1995); *State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 983 (10th Cir.1994); *Aetna Cas. & Sur. Co. v. Kelly,* 889 F.Supp. 535, 540–543 (D.R.I.1995)).

Finally, in applying the sixth factor, which disfavors the use of declaratory judgment as a tool for procedural fencing, there is nothing in the record that indicates Federal's consolidation of all of its arguments against coverage into one declaratory judgment was a procedural maneuver designed to create a race to res judicata or to achieve a federal hearing on these factual issues in a case that was not otherwise removable. The sixth *Scottsdale* factor does not favor granting a stay.

Because several of the *Scottsdale* factors weigh strongly in favor of a stay, especially those which consider the practicalities of judicial administration and comity to state courts, the Court concludes that insofar as this action prays the Court to declare Federal's indemnification obligations which turn on factual allegations squarely at issue in the Class Actions, a stay of Counts V–VIII of the declaratory judgment action would be prudent.

b. *Similar or related claims (Counts I through III).*

■ Counts I through III seek a declaratory judgment that Federal has no obligation to indemnify Defendants on the ground that the Submitted Matters and PPL Actions should be treated as one claim which falls outside the Excess Policy's coverage period. Federal bases this contention on three contract clauses each of which, generally stated, limits coverage of claims which are substantially similar or related to claims previously made against Defendants. Defendants assert that the Court will be required to inquire into facts underlying the PPL Actions, which have subsequently settled, and compare Defendants' conduct to the conduct in the Submitted Matters. Hr'g Tr. at 41, 47. Federal counters that it is possible to decide Counts I through III solely on the basis of the pleadings. *Id.* at 75.

After a review of several cases in which courts considered coverage disputes regarding contractual provisions such as those in Counts I through III, it is apparent that the extent of factual inquiry necessary beyond the pleadings is case specific. Whether the inquiry requires factual determinations beyond the facts set forth in the pleadings depends on the contract language and the scope of facts alleged in each claim. For example, the First Circuit, when applying Massachusetts law to a coverage dispute involving a prior and pending litigation clause and largely similar facts, concluded that the "prior and pending litigation" clause could be determined solely on the factual allegations set forth in the underlying complaints. *Fed. Ins. Co. v. Raytheon Co.,* 426 F.3d 491, 497–501 (1st Cir.2005).[14] On the other

---

**14.** The Federal policy at issue in *Raytheon* included a prior and pending litigation clause which stated:

The Company [Federal] shall not be liable for Loss on account of any Claim made against any Insured ... based upon, arising from, or in consequence of any demand,

hand, the Eighth Circuit, applying North Carolina law to interpret a "related claim" provision where the factual situations were connected but not co-extensive, found it necessary to establish the facts relating to each claim before evaluating whether the " 'facts, circumstances, situations, transactions or events' [were] (1) the same; (2) related; (3) part of the same series; or (4) part of a related series." [15] *Highwoods Props., Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917, 923 (8th Cir.2005). At this stage of the litigation, it is too early to determine the interpretation or construction of the policy and, thus, it is not possible to determine if addressing these Counts will require extensive factual inquiries. For the purposes of the present *Scottsdale* analysis, the Court is willing to accept that Counts I through III rest on contractual provisions which will necessitate only an examination of the pleadings, rather than inquiry into the underlying facts.

Applying the *Scottsdale* factors, once again factors one and two weigh in favor of denying a stay. A declaratory judgment has the potential to both settle legal relations and afford relief from uncertainty, insofar as any one of the three Counts may absolve Federal of any duty to indemnify Defendants. But, again, the first and second factors are tempered by the possibility that if one of these Counts does not resolve the dispute over Federal's duty to indemnify Defendants, the parties might be required to return to court to adjudicate the remaining, unresolved claims.

Presuming Counts I through III can be addressed solely by evaluation of the pleadings in the PPL Actions and the Submitted Matters, the third, fourth, fifth, and sixth *Scottsdale* factors do not support staying the inquiry into these Counts. Under the third factor, as was the case with the duty to advance defense costs, the State of California does not have a strong interest in the proceedings under Counts I through III. Because it does not appear that California law will govern the contract interpretation, the California state courts do not have a legal interest in the contract interpretation. Further, the coverage dispute between Federal and Defendants will not be raised in the adjudication already proceeding in California state court. Similarly, the fourth factor's efficiency interest will not be promoted by a stay. The insurance coverage dispute is not subject to adjudication in any other forum. The interest of efficiency would not be served by a stay of Counts I through III. Likewise, the interests underlying the fifth factor, comity to the state judicial system and desire to avoid unnecessary entanglements between the federal and state judicial systems, are also not at issue. So long as the Court is not required to make factual determinations in addressing Counts I through III, the Court will not be intruding on the factual and legal issues before the California state court. Without a re-

---

suit or other proceeding pending, or order, decree or judgment entered against any Insured, on or prior to [September 15, 2000], or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

*Raytheon*, 426 F.3d at 495. This language mirrors the pending and prior litigation clause in Section 7 of the Excess Policy (Count I). Compl. Ex. B at 7.

**15.** The *Highwoods* Policy defined "related claims" as:

all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events. *Highwoods Props.*, 407 F.3d at 922. This definition is largely the same as the definition of "related claims" set forth in the Primary and Excess Policies (Count II). Compl. Ex. A at 7.

lated state court proceeding addressing the same issues, there is no danger of entanglement between the court systems. Finally, the sixth factor weighs against a stay as there is no indication that the declaratory judgment action is being used as a device for procedural fencing.

In sum, under the presumption Counts I through III can be addressed solely by evaluation of the pleadings, none of the *Scottsdale* factors suggest that a stay is appropriate for Counts I through III. However, if upon further examination of the contractual language, it becomes clear that extensive factual inquiries will be required, the Court's analysis of the wisdom of staying the present motion may change.

#### c. *Qualifying "Loss" (Count IV).*

■ Count IV asks the Court to declare whether a "Loss" under the Excess Policy covers the damages sought by the Class Actions plaintiffs, that is, compensatory, restitutionary, and treble damages, as well as the cost of complying with non-monetary relief. Defendants argue that this Count should be stayed because a declaratory judgment would require a determination of the damages to which the Class Action plaintiffs are entitled. However, after examining Federal's Complaint and the contract language, the Court believes that the question of what will constitute "Loss" under the Excess Policy hinges largely on the interpretation of the Primary Policy. Further, the range of damages sought by the Class Action plaintiffs is concretely established in their pleadings. The Court will be able to determine whether "Loss" under the Excess Policy encompasses the range of damages sought by the Class Action plaintiffs without actually determinating the damages to which the Class Action plaintiffs are entitled.

Applying the *Scottsdale* factors, the first and second factors show that resolution of what constitutes a "Loss" under the Excess Policy will aid in clarifying and settling the legal relations between the parties and afford relief from uncertainty as to the duty to indemnify. Inquiry into the third *Scottsdale* factor, as with Counts I through III and IX through X, shows that a declaratory judgment proceeding would not interfere with any state interest, both because California will not have an interest in interpreting "Loss" and because the meaning of "Loss" will not be raised in the *Peterson* action. Similarly, under the fourth factor, the question of what will constitute "Loss" under the Excess Policy could not be more efficiently adjudicated in those actions since it is not an issue that will be raised in any of the Class Actions. An examination of the fifth factor finds that the inquiry into what constitutes a "Loss" also presents no threat of unnecessary entanglement of this Court with the California state courts since the *Peterson* Complaint has already set forth the damages sought by the *Peterson* plaintiffs, and this Court need not wait for resolution of the Class Actions before determining what constitutes a "Loss" under the Excess Policy. Finally, there is no indication that Federal's desire to clarify what qualifies as a "Loss" is merely a device of procedural fencing. In total, each of the six factors weighs against a stay of Count IV. The Court concludes, therefore, that there is no need for Count IV to be stayed until the damages are assessed in each of the Class Actions.

#### 3. *The potential for duplicative and piecemeal litigation.*

The first and second *Scottsdale* factors ask the Court to inquire whether a declaratory judgment will clarify and settle the legal relations at issue and whether the adjudication will afford relief from the uncertainty, insecurity, and controversy giving rise to the portion of these proceedings

under consideration. As a part of this examination, the Court must consider the litigation as a whole so as to avoid instances in which a declaratory judgment action is "used 'to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to interfere with an action which has already been instituted.'" *Ind–Com,* 139 F.3d at 422 (citing *Quarles,* 92 F.2d at 325); *see also Sherwin–Williams,* 343 F.3d at 390–93 (noting that in the interest of efficiency "a federal district court should avoid duplicative or piecemeal litigation where possible").

Here, the Court has found that the duty to advance defense costs is ready for adjudication. Additionally, it appears that certain Counts of Federal's declaratory judgment action regarding the duty to indemnify Defendants can proceed, namely Counts I through III and Count IV. On the other hand, the Court has concluded, after applying the *Scottsdale* factors, that Counts V through VIII should be stayed in the interests of efficiency, federalism, and comity to allow the state court proceedings to proceed. By addressing some of the Counts asking for a declaratory judgment on Federal's duty to indemnify, but not all of them, the Court creates the potential for piecemeal litigation of Federal's duty to indemnify Defendants.

Despite the possibility for duplicative or piecemeal litigation, the Court concludes that, on the whole, the interests in certainty and finality, as well as efficiency, support allowing Counts I through IV, IX and X to go forward while Counts V through VIII are stayed. First, the resolution of four of the eight Counts relating to Federal's duty to indemnify Defendants will further, if not totally satisfy, the interests of certainty and finality. If Federal is successful in demonstrating that there is no coverage or no duty to indemnify Defendants based on Counts I through III or Count IV, the entire controversy over Federal's duty to indemnify will be resolved. Thus, resolution of Counts I through IV has the potential to provide full relief to the litigants.

Additionally, grouping Counts I through III, IV, and IX through X together serves the interest of adjudicatory efficiency. This arrangement allows the Court to combine its inquiry into Federal's duty to advance defense costs in Counts XI and X, which will require an examination of the language of the Excess Policy and the Class Action pleadings, with its inquiry into Counts I through III and Count IV, which should also be limited to an examination of language in the Excess Policy and the pleadings in each of the Class Actions and the PPL Actions. An examination of Counts V through VIII, on the other hand, cannot be addressed by examination of the pleadings and interpretation of the Excess Policy alone. By adjudicating four of the eight Counts pertaining to Federal's duty to indemnify at the same time as the two Counts relating to Federal's duty to advance defense costs, the Court can efficiently address all inquiries that require similar analyses of the pleadings and interpretation of the Excess Policy.

Thus, the Court finds that the issues of Federal's duty to advance defense costs (Counts IX and X), coverage of related or similar claims (Counts I through III), and applicability of "Loss" (Count IV) will not be dismissed or stayed, while determination of the applicability of the Fraudulent Act, Intentional Act, Profit or Advantage, and Representation of Performance or Value exclusions (Counts V through VIII) will be stayed pending resolution of the *Peterson* action in California state court. However, if upon closer examination, it appears that Counts I through IV will require inquiry into the underlying facts in the PPL Actions and the Submitted Mat-

ters, the Court may decide it would be prudent to stay these portions of the declaratory judgment action to allow the fact-finding in the Class Actions to proceed.

### C. *Defendant's Motion to Transfer*

█ The Court may transfer an action to "any other district or division where it might have been brought" if doing so serves "the convenience of parties and witnesses" and "the interest of justice." 28 U.S.C. § 1404(a). "Change of venue, although within the discretion of the district court, should not be freely granted. Courts are in the business of deciding cases, not playing procedural hockey among available districts at the whim of dissatisfied parties." *In re Nine Mile Ltd.*, 692 F.2d 56, 61 (8th Cir.1982), *overruled on other grounds by Miss. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1311 (8th Cir.1990). "A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

In considering whether "the balance of convenience" warrants a transfer of venue under § 1404(a), the Court may consider: (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the accessibility to records and documents, (4) the location where the conduct complained of occurred, and (5) the applicability of each forum state's substantive law. *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 696 (8th Cir.1997). First, despite Defendants' vehement arguments to the contrary, the court cannot conclude that a California court will provide a more convenient forum for the parties. None of the parties are incorporated in the State of California. Instead, two of the three Defendants are incorporated in Iowa, and it is the fact that those two Defendants are named defendants in the underlying liga-

tion which has given rise to the coverage dispute. Additionally, Sammons and Federal both have their principal places of business in the Midwest. It appears to the Court that Iowa is a substantially more convenient venue for the parties than California.

Second, proceeding in Iowa will provide a more central location for potential witnesses. Because the Court will stay any inquiries that overlap with the factual inquiries in the pending Class Actions, only witnesses that can testify to the formation and performance of the Excess Policy will be required. Given that Sammons' contact on the Excess Policy is listed at a West Des Moines, Iowa address, Sammons' principal place of business is South Dakota, and Federal's principal place of business is Chicago, Illinois, Iowa is likely to prove a more convenient forum for witnesses from Federal and Sammons who can testify to the formation and performance of the Excess Policy. The Court recognizes that if the case progresses such that witness from the Class Actions are called to give testimony, a California venue would be more convenient to those witnesses located in California or Hawaii. Nevertheless, the Court believes that the central issue in this dispute is the insurance coverage dispute, not the underlying Class Actions and, thus, a venue most central to the parties and witnesses to the contract should be the priority. Furthermore, the Court notes that one of the California Class Actions is part of a multi-district litigation composed of litigation from both California and Iowa, suggesting that either Iowa or California will be equally convenient, or burdensome, to those witnesses.

Defendants place great emphasis on the facts that defense costs are accruing in California and many of the relevant invoices are located in California. Federal counters that the majority of documents

related to the formation and performance of the Excess. Policy will be located in Iowa. Even if more paperwork related to the defense costs is located in California compared to documentation of the Excess Policy in Iowa, the Court cannot conclude that the location of these papers weighs sufficiently against the convenience of an Iowa forum for the parties and potential witnesses. Likewise, while the Class Actions have given rise to the "conduct complained of," the parties' dispute regarding coverage has primarily taken place through correspondence. The Court does not believe proximity to the Class Actions would substantially further resolution of the coverage dispute between Federal and Defendants. Finally, while it is not clear that Iowa law will govern interpretation of the Excess Policy, given that the Excess Policy lists Sammon's contact at a West Des Moines, Iowa address and contains an Iowa amendatory endorsement, but contains no reference of any kind to California, it is more likely that Iowa law will govern the contract than California law. In sum, the Court believes that California does not present a more convenient forum for either the parties or the witnesses than Iowa.

■ Nor does the Court find that "the interest of justice" requires a transfer of venue to California. In weighing the interest of justice, the Court considers, inter alia: (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6) conflict of law issues, and (7) the advantages of having a local court determine questions of local law. *Terra Int'l*, 119 F.3d at 696. First, the Court believes that retaining the declaratory judgment before this Court will promote judicial economy since this Court has already begun the inquiry into the legal and factual issues in the underlying declaratory judgment action in ruling

on the present motion. Second, the Court notes that Federal chose to file this action in Iowa and this choice, despite Defendants' repeated allegations of forum shopping, was quite reasonable. Additionally, the Court has no reason to believe that Iowa will prove a more expensive forum in which to litigate than California, that an adjudication in Iowa would negatively impact either party's ability to enforce a judgment, or that the parties are less likely to receive a fair trial in Iowa. Finally, as noted above, it is more likely that Iowa law will govern interpretation of the Excess Policy than California law, and a federal court situated in Iowa, with greater experience with Iowa law, is better positioned to apply that state law. Moreover, the Court notes that the District Court of Central California independently determined that § 1404(a) justified the transfer of the California Action to Iowa. In making this determination, the District Court concluded that Federal was not engaged in forum shopping when it chose to file this action in Iowa and that Iowa provided a more convenient forum than California for declaratory judgment concerning the Class Actions.

Based on these considerations, the Court cannot conclude that a transfer of this action to California will serve "the convenience of parties and witnesses" or "the interest of justice." On these bases, Defendants' Motion to Transfer is denied.

## III. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss for Failure to State a Claim upon Which Relief Can be Granted or in the Alternative to Stay Action or in the Alternative to Transfer Venue (Clerk's No. 11) is GRANTED in part and DENIED in part. Defendants' request to Dismiss, and in the alternative to Transfer Venue, is DENIED on all

Counts. Defendants' alternative request to stay action is GRANTED as to Counts V through VIII, but is DENIED as to Counts I through IV and IX through X.

IT IS SO ORDERED.