# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2406

_____

Highwoods Properties, Inc.,         *
                                     *

            Appellant,             *

                                     *   Appeal from the United States

        v.                            *   District Court for the

                                     *   Western District of Missouri.

Executive Risk Indemnity, Inc.,      *

                                     *

            Appellee.              *

_____

Submitted: February 16, 2005
Filed: May 11, 2005

_____

Before WOLLMAN, HANSEN, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Highwoods Properties, Inc. appeals from the district court's[1] grant of summary judgment in favor of Executive Risk Indemnity, Inc., asserting that the district court erred in concluding that Highwoods was not entitled to coverage under its 1998 insurance policy with Executive Risk for its losses as a result of a lawsuit filed against it as an entity. We affirm.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

# I.

This case involves the interpretation of two insurance policies and the determination of which policy applies in light of two lawsuits—one filed in state court prior to the completion of a corporate takeover, and the other filed in federal court after the takeover. Highwoods first purchased a claims-made policy[2] in 1996 to insure its directors and officers in the event that claims were filed against them. The policy did not include coverage for the company as an entity, covering only claims made against individuals in covered positions within the company during the policy period from June 30, 1996, to June 30, 1998. Highwoods Insurance Policy No. 751-036108-96 (1996 Policy).

Highwoods arranged a merger with J.C. Nichols Company, a Missouri real estate company, that was to occur July 13, 1998. In January 1998, Dennis Wright, a J.C. Nichols shareholder, filed a lawsuit on behalf of himself and a potential class of shareholders (never certified) against J.C. Nichols, J.C. Nichols's officers, and Highwoods, claiming breach of fiduciary duty and seeking to enjoin the merger. Class Action Complaint, Wright v. Hoskins (Mo. Cir. Ct., Jan. 8, 1998) (No. CV98-0380). Highwoods filed a motion to dismiss, contending that it did not at that time have a fiduciary obligation to J.C. Nichols shareholders. The state court granted the motion and dismissed Wright's claims against Highwoods.

---

[2]Claims-made policies are limited-coverage policies that restrict the scope of coverage to situations in which "negligent harm is discovered and reported within the policy period" and in which a claim is made against the insured for the first time during the policy period. 43 Am. Jur. 2d Ins. § 689; see also Berry v. St. Paul Fire & Marine Ins. Co., 70 F.3d 981, 981 (8th Cir. 1995). The event that invokes coverage under claims-made policies occurs when the insured party transmits notice of a claim or potential claim to the insurer. See 7 Couch on Insurance § 102:20 n.66 (3d Ed. 1995 & Supp. 2004).

Soon after Wright was filed, Highwoods notified Executive Risk that a claim had been filed against it and sought coverage. Executive Risk denied coverage, stating that "[t]here is no coverage for the corporate entity other than for its obligation to indemnify Insured Persons. . . It is our understanding that no such proceeding has been commenced against any Insured Person. Therefore, there is at this time no 'Claim' as defined in [the policy]." Joint Appendix (JA) 855. Highwoods negotiated a new insurance policy in 1998 having a policy period from June 30, 1998 to June 30, 2001. Highwoods Insurance Policy No. 751-123663-98 (1998 Policy). Although it was also a claims-made policy, it included entity coverage for company securities claims in addition to coverage for Highwoods directors and officers.

John Flake moved to be substituted for Wright in the original lawsuit, but then voluntarily dismissed the claims without prejudice in state court. Flake instead filed a lawsuit in federal district court on October 2, 1998, claiming that J.C. Nichols and Highwoods violated federal securities laws based on misrepresentations in the prospectus and registration statement that were disseminated in connection with the merger. Class Action Complaint, Flake v. Hoskins (D. Kan. Oct. 2, 1998) (No. 98-02450). A class of shareholders was certified, seeking money damages. Highwoods eventually settled the class action for $5.7 million, after spending $4.8 million defending the lawsuit.

Highwoods notified Executive Risk when Flake was filed in federal court and sought coverage under the 1998 policy. Executive Risk again rejected coverage, stating that Flake was not a claim made within the policy period of the 1998 policy because a previous "purported class action [Wright] relating to the [merger] was brought against the same defendants" and related claims are treated as having been made when the first claim was made. JA 981. Flake was therefore considered to be "a Claim made within the policy period of the 1996 Policy." Id. Because the 1996 policy did not provide entity coverage, Executive Risk would not provide coverage for Flake.

-3-

Highwoods filed suit against Executive Risk in Missouri state court to recover its unreimbursed losses.[3]  Executive Risk removed the case to the United States District Court for the Western District of Missouri based on diversity, and both parties moved for summary judgment.  The district court granted summary judgment for Executive Risk, finding that <u>Wright</u> was a prior claim that barred coverage for <u>Flake</u> under the 1998 policy's "related claims" provision.  <u>See</u> 1998 Policy § II(K).  It concluded that <u>Flake</u> was related to <u>Wright</u> because it involved a "related series of facts, circumstances, situations, transactions or events."  D. Ct. Order of Oct 12, 1999, at 19-20 (declining to find ambiguity and stating that "liability is clearly precluded" under the phrase "related series of facts" because the <u>Flake</u> claim "is best described as the <u>Wright</u> Claim's successor").  The court concluded that "no objectively reasonable insured operating under the 1998 Policy could have expected that the <u>Flake</u> Federal Claim would be covered."  <u>Id.</u> at 21-22.

## II.

The outcome of this case turns on two inquiries: whether <u>Wright</u> falls within the definition of "claim" in the 1998 policy, and whether <u>Flake</u> is a related claim that is therefore considered to be the same claim as <u>Wright</u>, which was made outside the relevant policy period.  The parties do not dispute that the 1996 policy did not include entity coverage or that the 1998 policy did include such coverage.  They disagree, however, over whether the loss for <u>Flake</u> is covered by the terms of the 1998 policy.  Highwoods argues that <u>Flake</u> is an independent claim made during the policy period of the 1998 policy and that it is thus a covered claim based on the entity coverage included in the 1998 policy.  It asserts that <u>Wright</u> did not qualify as a claim under either policy and, alternatively, that it could not be considered a related claim to <u>Flake</u> because <u>Flake</u> was grounded in different facts and distinct legal theories.  Executive Risk argues that <u>Flake</u> and <u>Wright</u> are related claims under the 1998 policy because

_____

[3]Highwoods was able to recover $9.322 million from J. C. Nichols's insurer, leaving $1,156,999.73 in unreimbursed losses.

-4-

both claims arose out of the merger between J.C. Nichols and Highwoods, included similar allegations, and involved both the same putative class of plaintiffs and the same defendants.

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. Michalski v. Bank of Am. Ariz., 66 F.3d 993, 995 (8th Cir. 1995). As a general matter, we will affirm a grant of summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Id. In this case, the parties do not dispute the facts, but rather the application of the policy language to those facts as a matter of law. Because this is a diversity case, we also review the district court's interpretation of state law *de novo*. Id.

In diversity cases, we apply the choice of law principles of the state in which the district court is located. Washburn v. Soper, 319 F.3d 338, 341 (8th Cir. 2003). Missouri choice of law principles establish, and the parties do not dispute, that North Carolina law applies to this dispute because it is the state with the most significant relationship to the contract and the parties. See Superior Equip. Co. v. Maryland Cas. Co., 986 S.W.2d 477, 480 (Mo. Ct. App. 1998) (noting that Missouri has adopted the "most significant relationship" test, which requires the court to consider: "(a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties").

North Carolina law provides that the goal in interpreting an insurance contract is to arrive at the intent of the parties when the policy was issued, Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970), determined based upon "what a reasonable person in the position of the insured would have understood [the language] to mean." Woods v. Nationwide Mut. Ins. Co., 246 S.E.2d

773, 779 (N.C. 1978) (quotation omitted). Every word should be given meaning, based on the specific context, the policy as a whole, or ordinary usage. See Williams v. Nationwide Mut. Ins. Co., 152 S.E.2d 102, 107 (N.C. 1967). "Where a policy defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." Gaston County Dyeing Mach. Co. v. Northfield Ins. Co., 524 S.E.2d 558, 563 (N.C. 2000). If there are multiple common meanings, and the context does not clarify the one intended, the court should apply "the meaning most favorable to the policyholder." Wachovia, 172 S.E.2d at 522.

## A.

We ask first whether Wright constituted a claim as defined in the 1998 policy. As indicated above, when Executive Risk was originally given notice of Wright, it refused coverage because Wright was not a type of claim covered under the 1996 policy, in which the applicable definition of claim was limited to proceedings against Highwoods's directors and officers and did not include proceedings against the company as an entity. Highwoods argues that it was unfair for Executive Risk to first deny that Wright was a claim under the 1996 policy and to then assert that Wright was a claim under the 1998 policy that could operate to preclude coverage for subsequent factually-related claims. Highwoods's argument is unavailing because we are interpreting and applying only the 1998 policy, which was neither an extension of nor included all of the same terms as the 1996 policy.

The definition of "claim" in the 1998 policy stands alone, based on the description of the term in that policy; its meaning depends neither upon whether a lawsuit would have been recognized as a claim under a prior policy with different coverage nor upon whether coverage for that claim has already been sought and denied. Whether a legal proceeding meets the policy definition of "claim" is a

-6-

threshold question. The remaining language of the policy establishes whether the claim is covered by the policy.[4]

The term "claim" in the 1998 policy broadly encompasses proceedings against directors and officers, but includes only one type of claim against the entity: a "company securities claim." 1998 Policy, E. 10(4) (indicating that, for the purpose of integrating entity coverage, added by endorsement 10, into the remainder of the policy, "the term 'Claim' will also include any Company Securities Claim"). Endorsement 10, which added entity coverage, defines a company securities claim as "any Claim brought or maintained against the Company, but not against any Insured Person, for a Security Activity Wrongful Act." 1998 Policy, E.10(1)(c). It then defines a security activity wrongful act as:

> [A]ny actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company . . . , but only in connection with a purchase or sale, or an offer to purchase or sell, securities issued at any time by the Company.

1998 Policy, E.10(3).

We conclude that <u>Wright</u> was a company securities claim because it was brought against Highwoods as an entity and alleged a breach of fiduciary duty in

_____

[4]The 1998 policy states that Executive Risk will pay loss resulting from claims of wrongful acts by directors and officers that are made against them during the policy period. 1998 Policy § I(A). If claims of wrongful acts by Highwoods as an entity are made, however, Executive Risk will pay only company loss resulting from company securities claims made against the entity during the policy period. <u>Id.</u> E.10(2)(a). The policy's coverage is further limited by both exclusions and conditions: the exclusions restrict coverage for certain claims, even if they are made within the policy period; the conditions operate to narrow the scope of claims that are made within the policy period.

connection with the merger agreement in which Highwoods offered to exchange its shares for the J.C. Nichols shares held by J.C. Nichols shareholders.[5]  In addition, even though Highwoods did not owe any actual duty to J.C. Nichols shareholders at the time and was dismissed from Wright, the complaint still sufficiently alleged a security activity wrongful act.  In particular, the complaint alleged that defendants "were obligated to maximize the value to be paid to JCN's shareholders," but failed to do so, resulting in an inadequate offer to purchase the shares.  JA 464.

**B.**

Having concluded that Wright was a company securities claim, we must now consider whether and how that conclusion affects the application of the policy's terms to Flake.  We must give legal effect to the language of the policy based on what a reasonable person should have understood the language to mean.  See Woods, 146 S.E.2d at 779.  Even if Highwoods believed, when it negotiated the 1998 policy, that the entity coverage would cover subsequently made claims related to the merger, its belief was not necessarily a reasonable understanding of the language in the claims made policy.

The 1998 policy states that "[a] Claim is first made when it is commenced by the filing of a complaint, notice of charges, formal investigative order or similar document, or by the return of an indictment, against an Insured Person."  1998 Policy § IV(A)(1).  The related claims provision, however, is a condition (narrowing the scope of coverage) which states that "[a]ll Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made" as specified by the

---

[5]The district court focused on whether Wright was a "claim" rather than evaluating whether it was a "company securities claim," as was necessary because it was brought against Highwoods as an entity.  As we have noted, however, endorsement 10 brings "company securities claims" within the meaning of "claim" for purposes of applying the remainder of the policy.

Policy. Id. § IV(A)(4). In other words, although Flake is a company securities claim that was filed against Highwoods during the policy period, if Flake and Wright are "related claims," Flake will be treated as a continuation of Wright. Because Wright was made prior to and outside the policy period, Flake would also be considered to be made outside the policy period.

The policy defines "related claims" as:

> all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

Id. § II(K). Highwoods argues that Wright and Flake are not related because they alleged distinct wrongful acts that, although arising from the merger process, focused on distinct aspects of the merger and sought different remedies. We must examine, then, the "facts, circumstances, situations, transactions or events" that the two claims were based on, arose out of, resulted from or involved. Once those facts are established, we must ask, as the district court did when it examined four alternate bases for the application of the related claims provision, whether such "facts, circumstances, situations, transactions or events" are (1) the same; (2) related; (3) part of the same series; or (4) part of a related series.[6] Insofar as Wright and Flake may be construed as related claims, Highwoods urges us to conclude that the definition of "related claims" is ambiguous and should, therefore, be construed in its favor, precluding summary judgment. Executive Risk asserts that there is no ambiguity in

---

[6]The district court concluded that Wright and Flake were not based on the same facts. Without deciding if the second or third bases for applying the related claims provision applied, however, the district court reasoned that Wright and Flake clearly involved a related series of facts—the fourth basis for application—and were therefore related claims. D. Ct. Order of May 11, 2004, at 16-17.

the definition of "related claims," and that the provision applies to establish that Wright and Flake constitute a single claim.

Whether a policy is ambiguous is a question of law. McCuen v. American Cas. Co., 946 F.2d 1401, 1408 (8th Cir. 1991). Under North Carolina law, "ambiguous provisions will be construed against the insurer and in favor of the insured." State Capital Ins. Co. v. Nationwide Mut. Ins. Co., 350 S.E.2d 66, 68 (N.C. 1986). Before this rule of construction applies, however, the court must find a phrase to be ambiguous. An ambiguity exists only if "the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." Wachovia, 172 S.E.2d at 522. Ambiguity is not automatically established, however, "simply because a plaintiff makes a claim based on a construction of the insurance policy's language contrary to that of the company's interpretation." Christ Lutheran Church by & through Matthews v. State Farm Fire & Cas. Co., 471 S.E.2d 124, 125 (N.C. Ct. App. 1996).

Context is often central to the way in which policy language is applied: the same language may be found both ambiguous and unambiguous as applied to different facts. We will apply the ordinary meaning of particular terms to the facts of the case to determine if it is ambiguous as to those facts. See Kolb v. Paul Revere Life Ins. Co., 355 F.3d 1132, 1135-36 (8th Cir. 2004) (finding the definition of "accidental bodily injury" ambiguous only in terms of how it applied to the facts of the particular case and not as a general matter). We found policy language ambiguous in McCuen, where the policy stated that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts" would be viewed as a single loss and receive limited coverage. 946 F.2d at 1407. We found the words "similar" and "interrelated"—when the only connection between the loans that created the losses at issue was that they were made to the same borrower—created "substantial ambiguities" because they were "so elastic, so lacking in concrete content." Id. at 1407-08. Highwoods argues that McCuen's reasoning

requires us to find ambiguity here because the terms "related" and "series" are equally elastic, capable of being construed to connect almost any set of facts. We disagree.

We believe that the contextualized approach of the Seventh Circuit in <u>Gregory v. Home Ins. Co.</u>, 876 F.2d 602 (7th Cir. 1989), is appropriate and consistent with our prior holdings. <u>Gregory</u> held that the term "related" had a common meaning sufficiently clear to be applied to the particular facts at issue. Noting that the meaning of "related" "covers a very broad range of connections, both causal and logical," <u>Gregory</u> still found that the facts of the case "comfortably fit within" the term's natural scope. <u>Id.</u> at 606; <u>see also</u> <u>Continental Cas. Co. v. Wendt</u>, 205 F.3d 1258, 1263-64 (11th Cir. 2000) (per curiam) (adopting opinion in <u>Continental Cas. Co. v. Hall</u>, No. 97-323-CIV-OC-10B (M.D. Fla. 1999), which used the dictionary definition of "related" and found that certain wrongful acts, although involving various types of acts that produced different harms, were clearly related because they were "aimed at a single particular goal," and constituted "a single course of conduct"). We will not automatically conclude that such broad terms are necessarily ambiguous and will not always construe them in favor of the insured. <u>See</u> <u>Gregory</u>, 876 F.2d at 606. We conclude that a term should be found unambiguous if the facts of the case "comfortably fit within the commonly accepted definition of the concept," but may be ambiguous if the facts fall on the margins of a broad reading. <u>See</u> <u>id.</u> The facts of <u>McCuen</u> were close to the margins; this case is not.

The meaning of the terms "related" and "series" do have common meanings sufficiently clear to be applied. The Merriam-Webster's Collegiate Dictionary 10th Ed. (1998) defines "related" as "connected by reason of an established or discoverable relation." "Relation" is then defined as "an aspect or quality (as resemblance) that connects two or more things or parts as being or belonging or working together or as being of the same kind." A "series" is "a number of things or events of the same class coming one after another in spacial or temporal succession."

-11-

When we apply these terms to Wright and Flake, we conclude that they are related claims, falling within the natural scope of the related claims provision. The two cases did not arise out of identical facts, but were grounded in actions taken by the defendants in relation to the acquisition of J.C. Nichols by Highwoods. Wright alleged that the merger agreement, published prior to the merger itself, evidenced a failure to carry out fiduciary obligations because the defendants had "engaged in a plan and scheme to benefit themselves at the expense of the members of the class." JA 461. The Wright complaint expressed the conclusion that:

> [D]efendants have failed to maximize shareholder value; have failed to provide all material information necessary for JCN shareholders to make an informed decision whether to vote in favor of the proposed merger; and have otherwise violated their fiduciary obligations to class members.

JA 467. Flake alleged that misrepresentations appeared in several documents published in conjunction with the merger, including the joint proxy prospectus and some letters that were disseminated to shareholders in order to encourage their approval of the merger. Similar to Wright, the Flake complaint also asserted that the merger was designed to serve the interests of the Nichols family, and that the misrepresentations in the documents were designed to obscure the parties' actual motivations and obtain favorable votes for the merger. Flake alleged that these misrepresentations amounted to violations of securities laws, in addition to constituting breaches of the defendants' fiduciary duties.

These facts indicate that the two cases meet the definition of "related" because the circumstances have an established connection or resemblance, and they both involve communications to shareholders in relation to the merger that are allegedly incomplete and deceptive. The two complaints included many of the same factual allegations, although Flake added a number of facts that had occurred since Wright was filed. The term "series" also reasonably applies in this context because the

alleged deceptive and harmful actions occurred through the promulgation of several related documents issued in temporal succession, building on one another and resulting in the accomplishment of the merger.

We therefore conclude that the related claims provision is not ambiguous as to these facts; Wright and Flake at the very least fall within the scope of the fourth application: they are based on a "related series of facts, circumstances, situations, transactions or events."[7] Highwoods's claim that the term "related" is indeterminate and could be used to connect any two claims is not sufficient to establish that the term is necessarily devoid of meaning in every context. We may not find ambiguity where it does not exist in order to reach a different result. See Ledford v. Nationwide Mut. Ins. Co., 453 S.E.2d 866, 869 (N.C. Ct. App. 1995) (stating that "the court must enforce the [insurance] policy as written and may not reconstruct it under the guise of interpreting an ambiguous provision." (quotation omitted)). We agree with the district court that the facts giving rise to Wright evolved into Flake, and that Flake "is best described as the Wright claim's successor." D. Ct. Order of May 11, 2004, at 20-21. By operation of the policy, the claims therefore constitute a single claim that was made outside the policy period of the 1998 policy. Because entity coverage was not included in the 1996 policy, and because a logical and reasonable application of the 1998 policy language operates to preclude coverage for Flake, summary judgment was appropriate for Executive Risk.

The judgment is affirmed.

_____

[7]We believe the second application of the related claims provision—related facts—may also apply to the facts underlying these two cases, but decline to decide because we find that the facts fall clearly within the scope of the broader fourth application.