Joseph L. HEALEY, III, an individual, Plaintiff,

v.

I–FLOW, LLC, formerly known as I–Flow Corporation; DJO, LLC; and DJO Incorporated, Defendants.

Civ. No. 09–3541 (JRT/JJK).

United States District Court, D. Minnesota.

April 10, 2012.

Charles H. Thronson, James T. Blanch, Richard E. Mrazik, Parsons Behle & Latimer, Colin P. King, Jessica A. Andrew, Paul M. Simmons, Dewsnup, King & Olsen, Salt Lake City, UT, Richard A. Lockridge, Yvonne M. Flaherty, Lockridge Grindal Nauen PLLP, Minneapolis, MN, for Plaintiff.

Christian M. Ryba, Mitchell P. Morinec, Robert J. McLaughlin, Segal McCambridge Singer & Mahoney, Chicago, IL, Michael C. Lindberg, Benjamin A. Johnson, Johnson & Lindberg, PA, Bradley J. Lindeman, Bryan R. Browning, Elizabeth Snyder Poeschl, Jon R. Russell, Meagher & Geer, PLLP, Minneapolis, MN, for Defendants.

## ORDER AND MEMORANDUM

JEFFREY J. KEYES, United States Magistrate Judge.

This matter is before the Court on Plaintiff's Motion for Leave to Amend his Complaint to Assert a Claim for Punitive Damages (Doc. No. 66). Based on the files, and all the records and proceedings herein, and on the arguments of counsel, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Leave to Amend his Complaint to Assert a Claim for Punitive Damages (Doc. No. 66), is **DENIED;** and

2. The attached Memorandum is incorporated by reference.

## MEMORANDUM

### I. Background

I–Flow manufactures Pain Buster® pain pumps, which are "medical device[s] intended to deliver, via catheter, a continuous dose of pain medication directly into the operative site immediately following shoulder surgery." (Doc. No. 1, Compl. ¶ 8.) It got into the business of manufacturing pain pumps in 1996 when it acquired the pain pump product line of another manufacturer. DJO, LLC is a pain pump distributor, and DJO Incorporated is a holding company of DJO, LLC (collectively, "DJO").

In 1998, I–Flow submitted a 510(k) application to the FDA for clearance to market its own version of the pain pump with the indication that it was intended for use in intraoperative sites for postoperative pain management after surgery, and this application was approved. Also in 1998, I–Flow entered into a "Distribution Agreement" with DJO, LLC, which provided that DJO, LLC would become the exclusive United States and Canadian distributor for orthopedic surgery applications of I–Flow's PainBuster® pain pumps. Pursuant to the Distribution Agreement, I–Flow was responsible for obtaining all regulatory clearances, including those with the FDA, for the pain pumps distributed by DJO, LLC. I–Flow then submitted a new 510(k) application to the FDA in August 1998 to obtain clearance to expand the indications for use that would appear on the labeling of its product to state that: "The PainBuster Infusion Kit is intended to provide continuous infusion of a local anesthetic directly into the intraoperative or intra-articular site for postoperative pain management." (Doc. No. 69, Declaration of Paul Simmons ("Simmons Decl.") ¶ 3, Ex. 2.) The addition of "intra-articular site" to the indications for use was a reference to utilizing the pain pump to infuse an

anesthetic in the joint space—the "intra-articular site"—for a twenty-four to forty-eight hour period after orthopedic surgery. The FDA did not, however, grant I–Flow the clearance to market its products with the specific indication for use in an intra-articular site.

Plaintiff had shoulder surgeries on October 1, 2002, and May 18, 2004, and alleges that his doctors implanted I–Flow manufactured Pain Buster® pain pumps in his shoulder joint following the surgeries to administer an anesthetic for several days immediately after the surgeries to relieve pain. Plaintiff claims that this continuous injection of anesthetic medication into the shoulder joint space (the "intra-articular space" or the "synovial cavity") destroyed his shoulder cartilage—a debilitating condition known as glenohumeral chondrolysis.

Plaintiff filed this case against Defendants on December 11, 2009, asserting claims for negligence and civil conspiracy between I–Flow and DJO. (Doc. No. 1.) According to Plaintiff, "Defendants never performed any safety testing or inquiry for [intra-articular space] application, and three times the FDA turned down I–Flow's applications for clearance to market the pumps for orthopedic or intra-articular uses because of the lack of safety data." (Doc. No. 68, Mem. in Supp. of Pl.'s Mot. for Leave to Amend his Compl. to Assert a Claim for Punitive Damages ("Pl.'s Mem.") 1.) Plaintiff asserts that even though Defendants had not established the safety of the use of the I–Flow pain pump in orthopedic surgery in an intra-articular space and had not obtained FDA clearance to market it for that use, "Defendants engaged in a lucrative and longstanding nationwide campaign to do precisely what the FDA had told Defendants they could not do: Promote their pain pumps to orthopedic surgeons for intra-articular uses, which Defendants successfully did with nary a

word to anyone about the untested, uncleared, and literally experimental nature of their product for shoulder stabilization procedures." (Id.) Plaintiff further contends that if I–Flow had done a meaningful review of the medical literature to determine whether use of a pain pump in the joint space following orthopedic surgery was safe, "I–Flow would have learned that continuously exposing articular cartilage to anesthetics, or even to normal saline, can have a toxic effect on cartilage cells." (Id. at 6.) Plaintiff alleges that I–Flow learned about an association between pain pumps and chondrolysis in 2005 or early 2006 (i.e., after Plaintiff's second surgery in 2004), but did nothing about it until January 2007, when it added a warning about chondrolysis to the directions for use of the product.

On November 15, 2011, Plaintiff filed a Motion for Leave to Amend his Complaint to Assert a Claim for Punitive Damages, which is the motion currently pending before the Court. (Doc. No. 66.) In that motion, Plaintiff contends that he should be allowed to amend his Complaint to seek punitive damages because Defendants acted with deliberate disregard of his rights and safety by marketing and promoting the pain pump without researching or testing the safety of its use in intra-articular sites, by disregarding the FDA's denial of clearance, and by failing to inform doctors and patients of the FDA's denial.

## II. Analysis

### A. Standard of Review

In diversity actions in this Court, the pleading of punitive damage claims must generally conform to the requirements of Minnesota Statutes section § 549.191. *Ulrich v. City of Crosby*, 848 F.Supp. 861, 866 (D.Minn.1994); *see also Bunker v. Meshbesher*, 147 F.3d 691, 696

(8th Cir.1998). Specifically, section 549.191 provides:

> Upon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages. For purposes of tolling the statute of limitations, pleadings amended under this section relate back to the time the action was commenced.

Section 549.191 thus requires the court to perform a gatekeeping function to screen out "unmeritorious claims for punitive damages." *Swanlund v. Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Minn.Ct.App. 1990). Our federal court utilizes section 549.191's gatekeeping procedure in diversity cases because it discourages forum shopping between state and federal court. This also reduces the influence that a "plaintiff's ability to brandish a claim for punitive damages as a tool for promoting an advantageous settlement or otherwise advancing his claims" may have on his selection of a federal forum. *Zeelan Indus., Inc. v. deZeeuw*, 706 F.Supp. 702, 705 (D.Minn.1989).

Under section 549.191, a plaintiff who seeks to assert a punitive damage claim must first obtain leave of the Court to do so, based on a prima facie showing of entitlement. *See Ulrich*, 848 F.Supp. at 867. A plaintiff need not demonstrate an entitlement to punitive damages per se, but only an entitlement to allege such damages. If the Court finds such prima

facie evidence, "the court shall grant the moving party permission to amend the pleadings to claim punitive damages." *Id.*

"[A] prima facie case simply means one that prevails in the absence of evidence invalidating it." *Blumberg v. Palm*, 238 Minn. 249, 253, 56 N.W.2d 412, 415 (1953); *McKenzie v. N. States Power Co.*, 440 N.W.2d 183, 184 (Minn.Ct.App. 1989) ("Prima facie evidence is evidence which, if unrebutted, would support a judgment in the party's favor."). Thus, under the strictures of section 549.191, "the Court reviews the evidence in support of a Motion to Amend as the Court would review a Motion for a Directed Verdict—now denominated in the Federal Rules of Civil Procedure as a Motion for the Entry of Judgment as a matter of law." *Ulrich*, 848 F.Supp. at 867; *see also Nw. Airlines, Inc. v. Am. Airlines, Inc.*, 870 F.Supp. 1499, 1502–03 (D.Minn.1994) (stating that evidence submitted in opposition to the motion is not considered). In other words, in reaching the determination whether Plaintiff has established a prima facie case for punitive damages, the Court makes no credibility rulings, and does not consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof, but the Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a prima facie showing that the substantive requirements for punitive damages have been met. *Ulrich*, 848 F.Supp. at 867.

Section 549.191, however, does not expressly state a substantive standard or a quantum of proof that the movant must produce to establish a prima facie case of entitlement to punitive damages. In the typical diversity case in this Court, the Court applies section 549.191 to determine whether Plaintiff can show an entitlement to punitive damages under Minnesota Statute section 549.20, which is Minnesota's

punitive damages law. *See In re Levaquin Prods. Liab. Litig. (Levaquin II )*, No. 08–cv–5743 (JRT), 2010 WL 4867588, at *2 (D.Minn. Nov. 23, 2010) ("The Minnesota punitive damage statute is statutorily constructed in two separate parts: Section 549.191 describes the pleading standard subject to the substantive standard of Section 549.20."). But section 549.191 does not require that the plaintiff must always make out a prima facie case of entitlement to punitive damages under Minnesota's punitive damages standards in order to be allowed to amend. *See* Minn.Stat. § 549.191 ("The motion must allege the applicable legal basis under section 549.20 *or other law* for awarding punitive damages . . .") (emphasis added). It may well be that the punitive damages law of a state other than Minnesota may apply and, if it does, the plaintiff must make out the prima facie case for punitive damages under the applicable "other" punitive damages law. In other words, in a diversity case in this federal court a party must always comply with the procedural requirement of section 549.191 before being allowed to plead for punitive damages but the substantive standards of section 549.20—i.e., clear and convincing evidence of the deliberate disregard for the rights or safety of others—do not always come into play. Thus, if the applicable punitive damages law does not allow punitive damages for the type of claim at issue, then of course the plaintiff could not meet section 549.191 requirements because the moving party could not make out a prima facie showing of entitlement to punitive damages. *See Burke v. DJO, LLC*, No. 10cv2209 (JRT/TNL), 2012 WL 383948, at *3–*5 (D.Minn. Feb. 6, 2012) (denying leave to amend to assert punitive damages in pain pump case where Massachusetts law did not permit punitive damages for the common law claims asserted by plaintiff).

Here, Plaintiff brings his motion for leave to amend to assert punitive damages under section 549.20, assuming that Minnesota's law on punitive damages will apply. But a plaintiff in a diversity case does not get to simply choose the punitive damages law that will apply in the case. DJO—but not I–Flow—argues that Virginia's punitive damages law should apply; DJO points to the fact that Plaintiff is a Virginia resident, his surgeries were conducted in Virginia, all relevant witnesses reside in Virginia, and the only alleged contact Minnesota has to the litigation is that the Defendants, neither of whom is headquartered in Minnesota, transact business in Minnesota.

 In a case over which a federal court has diversity jurisdiction, the court applies the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Highwoods Props., Inc. v. Executive Risk Indem., Inc.*, 407 F.3d 917, 920 (8th Cir.2005). Before engaging in a full choice-of-law analysis, however, the court must first determine if a conflict exists. *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007); *see also Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn.1994) (stating that courts are first required to consider "whether the choice of one state's law over another creates an actual conflict"). If a conflict does exist and it is outcome determinative, the Court must then analyze and apply Minnesota's choice-of-law rules to determine whether Virginia or Minnesota law should apply. *See Glover v. Merck & Co., Inc.*, 345 F.Supp.2d 994, 997 (D.Minn.2004) (stating that a conflict exists if the rule of a particular state is outcome determinative); *see also Christian v. Birch*, 763 N.W.2d 50, 55 (Minn.Ct. App.2009) (same). The Court must also consider whether the law of each state may be constitutionally applied. *Glover*, 345 F.Supp.2d at 997 (citing *Jepson*, 513

N.W.2d at 469). "For a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of law is neither arbitrary nor fundamentally unfair." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 590 N.W.2d 670, 672 (Minn.Ct.App.1999).

If the Court concludes that there is no actual conflict between the laws of the two states, then the inquiry proceeds no further, and the Court applies Minnesota law. *See Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 715 F.Supp.2d 871, 875–76 (D.Minn.2010) (applying Minnesota law to an issue when there was no outcome-determinative difference between the potentially applicable state's law); *see also Prudential*, 475 F.3d at 924 (stating that the court need not decide whether Missouri law or New York law applies because the outcome would be the same under either law).

The Court concludes that, for purposes of this motion, there is no conflict between Minnesota and Virginia's punitive damages laws. In order to establish a claim for punitive damages in Minnesota, a party must show—by clear and convincing evidence—that the Defendant acted with "deliberate disregard for the rights or safety of others." Minn.Stat. § 549.20, subd. 1(a). The pivotal phrase "deliberate disregard" is statutorily defined in section 549.20 as follows:

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn.Stat. § 549.20, subd. 1(b). Hence, for an award of punitive damages, the statute requires: (1) knowledge of or an intentional disregard of facts that make injury to the plaintiff's rights probable; and (2) action despite such knowledge. "A mere showing of negligence is not sufficient" to sustain a claim for punitive damages. *Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 268 (Minn.1992). The deliberate disregard standard in Minnesota is a high standard, which is evidenced by the fact that in 1990 the Minnesota Legislature amended section 549.20 by replacing the phrase "willful indifference" with "deliberate disregard"; the Minnesota Court of Appeals has characterized this new standard as a "heightened" one. *See Bougie v. Sibley Manor, Inc.*, 504 N.W.2d 493, 500 n. 4 (Minn.Ct.App.1993).

Virginia law also "imposes a heavy burden on a plaintiff seeking punitive damages." *Cummings v. Fisher–Price, Inc.*, 857 F.Supp. 502, 505 (W.D.Va. 1994). Punitive damages are only available in Virginia if a plaintiff shows—by clear and convincing evidence—that a defendant acted or made a decision that was wanton, willful, malicious, or in conscious disregard of the rights of others. *Ford Motor Co. v. Bartholomew*, 224 Va. 421, 297 S.E.2d 675, 684 (1982); *Binns v. Binns*, No. 2:10CV428, 2011 WL 5024407, at *4 (E.D.Va. Sept. 28, 2011) ("Under Virginia law, punitive damages may be awarded if it is demonstrated by clear and convincing evidence that the defendants acted with actual or express malice."). This standard for establishing a right to punitive damages requires evidence beyond even gross negligence. *Doe v.*

*Isaacs,* 265 Va. 531, 579 S.E.2d 174, 178 (2003) (finding that complete neglect of others' safety amounted to gross negligence, which shocks fair-minded people, but was less than willful recklessness required for punitive damages). To sustain a claim for punitive damages in a personal injury case in Virginia, the plaintiff must demonstrate negligence which is "so willful or wanton as to evince a conscious disregard of the rights of others, [or] malicious conduct...." *Id.* at 176 (quoting *Booth v. Robertson,* 236 Va. 269, 374 S.E.2d 1, 3 (1988)). The Virginia Supreme Court has defined "willful and wanton negligence" as "action undertaken in conscious disregard of another's rights, or with reckless indifference to consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Id.* (quoting *Woods v. Mendez,* 265 Va. 68, 574 S.E.2d 263, 268 (2003)). As the Federal District Courts for the Eastern and Western Districts of Virginia have found, Virginia cases upholding punitive damages have involved conduct that "either approaches actual malice or exhibits extreme recklessness resulting in clearly foreseeable and immediate injury." *Cummings,* 857 F.Supp. at 505; *Blakely v. Austin–Weston Ctr. for Cosmetic Surgery,* 348 F.Supp.2d 673, 678 (E.D.Va.2004).

The Court concludes that although identical terminology is not used by both states, there is no actual conflict between Minnesota and Virginia's punitive damage laws that is outcome determinative. Both laws punish the same type of conduct— conduct that amounts to a deliberate act with knowledge of facts that make harm very likely. Thus, if Plaintiff cannot sustain the burden of proving a *prima facie* case of entitlement to punitive damages under Minn.Stat. section 549.20, then his claim would necessarily fail under Virginia law as well.[1]

With that settled, the Court now turns to the question of whether Plaintiff has met the requirements of Minnesota's gatekeeping statute—i.e., whether he has presented prima facie evidence that Defendants deliberately disregarded the rights or safety of others by having knowledge of facts, or intentionally disregarding facts, that created a high probability of injury to Plaintiff, and yet deliberately proceeded to act in conscious or intentional disregard of the high degree of probability of injury or with indifference to this high probability of injury. In doing so, the Court must analyze what Defendants knew and when they knew it.

### B. Prima Facie Evidence

#### i. The FDA Approval Process

■ Before marketing a Class III medical device, such as a pain pump, in the United States a manufacturer is required to obtain clearance from the FDA. 21 U.S.C. § 360e(a). Generally, that means the device must receive pre-market approval ("PMA"). *See id.* "This premarket approval (PMA) process requires the applicant to demonstrate a 'reasonable assurance' that the device is both 'safe ... [and] effective under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof[.]'" *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 344, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (quoting §§ 360e(d)(2)(A), (B)).

---

**1.** DJO points out that Virginia places a cap on punitive damages, but Minnesota does not. This, however, is an issue relative to the amount of ultimate recovery in damages, not an issue relative to whether punitive damages can be awarded at all in light of the facts of this case. Therefore, the Court does not view Virginia's cap as a sufficient conflict with Minnesota's law to require the Court to apply Virginia's punitive damages statute on this pre-trial motion.

This is a time consuming process. *Id.;* *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 478–79, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (stating that PMA is a "rigorous" process whereby "[m]anufacturers must submit detailed information regarding the safety and efficacy of their services, which the FDA then reviews, spending an average of 1,200 hours on each submission").

However, not all devices are required to receive PMA. One exception to the PMA requirement is for those devices that are "substantially equivalent" to pre-existing devices. *See* 21 U.S.C. § 360e(b)(1)(B). Those devices are subject to a " § 510(k) process," (named after the original section in the original Act), which involves submitting a "premarket notification" to the FDA.[2] 21 U.S.C. § 360e(b)(1)(B); *Medtronic,* 518 U.S. at 478, 116 S.Ct. 2240. "If the FDA concludes on the basis of the § 510(k) notification that the device is 'substantially equivalent' to a preexisting device, it can be marketed without further regulatory analysis[.]" *Medtronic,* 518 U.S. at 478, 116 S.Ct. 2240. This process is significantly easier and quicker than PMA. *Id.* at 478–79, 116 S.Ct. 2240 (stating that "§ 510(k) review is completed in an average of only 20 hours[,] ... requires little information, [and] rarely elicits a negative response from the FDA") (quotations omitted).

To show "substantial equivalence" does not mean that the new and predicate devices must be identical. Rather, "substantial equivalence" means that the new device has the same intended uses as the predicate device, and either (1) those two devices have the same technological characteristics, or (2) the new device is demonstrably safe and effective and does not raise questions of safety and effectiveness different than the predicate device. 21 U.S.C. § 360c(i)(1)(A). Substantial equivalency can be established by comparing "materials, design considerations, energy expected to be used or delivered by the device," and operational principles, as well as device functions, scientific bases, and performance characteristics. 21 C.F.R. §§ 807.87(f), 807.92(a)(4). While clinical safety trials generally are not necessary for § 510(k) submissions, in some cases the FDA may require clinical trials to substantiate the safety and effectiveness of a device, as well as post-market surveillance, for a § 510(k) clearance. *See* 21 C.F.R. § 807.92(b).

A device may not be marketed in the United States until the § 510(k) applicant receives a letter declaring the device substantially equivalent, thereby "clearing" the device for marketing. It is important to note that in the § 510(k) process, the device is not officially approved by the FDA as being safe and effective. 21 C.F.R. § 807.97. Instead, it is said to be § 510(k)-cleared for marketing; in other words, it is substantially equivalent to a medical device already on the market.

In 1998, as described above, I–Flow submitted a § 510(k) application for its PainBuster® Infusion System. It was cleared by the FDA for the intended use "to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management." (Doc. No. 69, Simmons Decl. ¶ 18, Ex. 17.) Also in 1998, I–Flow announced that it was entering into a Distribution Agreement with DJO pursuant to which DJO would become the exclusive United States and Canadian distributor for orthopedic surgery applications of I–Flow's PainBuster®

---

**2.** Premarket notifications are also required both when a medical device is initially introduced into the commercial market for the first time and whenever a previously approved medical device is to be significantly modified in its intended use. 21 C.F.R. § 807.81(a).

pain pumps. (*Id.* ¶ 16, Ex. 15.) In August 1998, I–Flow submitted another § 510(k) application to the FDA. The reason for the new submission was to add or expand the "indications for use" that would be shown on the labeling of the I–Flow pain pump.[3] The new § 510(k) application utilized the previously cleared I–Flow PainBuster® Infusion System as the substantially equivalent predicate device and proposed the following indication for use: "The Pain-Buster Infusion Kit is intended to provide continuous infusion of a local anesthetic directly into the intraoperative or intra-articular site for postoperative pain management." (*Id.* ¶ 3, Ex. 2.)

The FDA did not, however, clear the product for the expanded indication of use for the intra-articular site. A November 13, 1998 memorandum from the FDA reviewer explains:

This 510k was originally submitted with an expanded indications for use, i.e., for continuous infusion of a local anesthetic directly into the intra-articular site for postoperative pain management, however, there was no accompanying data to demonstrate that this device may be used safely and effectively with this use. I had conferred with Marie Schroeder, Sahar Dawisha MD, and Bernard Berne MD, of REDB; Mark Melkerson of ORDB; Michael Bazaral MD of DCRND; and Hung Trinh and Patricia Cricenti of GHDB regarding the specific use for this device. It was generally agreed that additional information was required to determine the safety and effectiveness of the device with this use. (*Id.* at Ex. 7.)

I–Flow did not submit the additional safety and effectiveness data; instead, it modified the indications for use on this § 510(k) application by deleting all references to orthopedic surgery and intra-articular use. After the changes, the indications-for-use labeling read:

INTENDED USE: To provide continuous infusion of a local anesthetic directly into the intra-operative (soft tissue/body cavity) site for general surgery for postoperative pain management. Additional routes of administration include percutaneous and subcutaneous infusion.

(*Id.*) The FDA reviewer concluded that this labeling was adequate: "It has been revised to delete any reference to use in the intra-articular side (sic). It includes appropriate warnings, contraindications, and notes for safe use of this device." (*Id.*)

There is nothing in the evidence submitted by Plaintiff to show that the FDA ever concluded that use of the PainBuster® in the intra-articular joint space after orthopedic surgery was *not* safe and effective. At most, the FDA was simply saying that its previous § 510(k) clearance for the I–Flow pain pump did not encompass the indication for use in the intra-articular site and thus it would require "additional information ... to determine the safety and effectiveness of the device with this use"; I–Flow had not submitted such information. (*Id.*) Significantly, the FDA did not

---

**3.** "Indications for Use," "label," and "labeling" are terms of art in FDA law. "Labeling" includes "all labels and other written, printed or graphic matter" that accompanies the medical device. "Most, if not all, labeling is advertising.... Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising." *United States v. Research Labs.*, 126 F.2d 42, 45 (9th Cir.1942), *cert. denied*, 317 U.S. 656, 63 S.Ct. 54, 87 L.Ed. 528 (1942). The indications-for-use section of an FDA-approved label communicates what uses have been proven safe and effective. Products are § 510(k)-cleared for the intended uses set forth in the applicant's description of the indications for use that would be included in the seller's labeling.

require any contraindication labeling to warn surgeons about using the pain pump in the intra-articular space. In light of the fact that the FDA consulted with a group of seven experts about specific use of the pain pump in the intra-articular site after orthopedic surgery, if there was any known risk that it was highly probable that the I–Flow pain pump would destroy the patient's cartilage when used in the intra-articular space, the FDA would have most certainly required such a contraindication.

In addition, there is nothing in the documents or testimony submitted by Plaintiff about I–Flow's § 510(k) application process that shows that I–Flow knew that there was any risk that use of the I–Flow pain pump in the intra-articular space would cause debilitating cartilage destruction. Indeed, the only medical literature supplied by Plaintiff from I–Flow's files were the several articles that I–Flow's Vice President of Regulatory and Legal Affairs sent to the FDA in support of his argument that there was data showing that it was safe to use the pain pump in the intra-articular space. Plaintiff does not contend that these articles alerted I–Flow to any risk of injury.

As for DJO, Plaintiff has submitted correspondence that DJO had with a consulting firm, C.L. McIntosh & Associates, Inc., about how to deal with the regulatory problem created by I–Flow's failure to obtain clearance from the FDA to include intra-articular use in the indications for use. These documents show that the consulting firm contacted the FDA and then advised DJO that "orthopedic indications even in soft tissue do not fall into the cleared intended use category, 'to provide continuous infusion of a local anesthetic directly into the intraoperative site for postoperative pain management.' The indications cleared are for general use and the orthopedic indications would be for specific uses and have different requirements." (Doc. No. 69, Simmons Decl. ¶ 17, Ex. 16 at 2.) The FDA had told the consulting firm's representative that no infusion pumps of any manufacturer had been cleared with orthopedic indications and that "a company would be most likely required to submit clinical data in support of a 510(k)," but the FDA representative would not say what the exact requirements would be for such a clinical study. (Id.)

Although these documents show that DJO knew that the FDA had refused to clear the I–Flow pain pump for the indication of use in orthopedic surgery in joint space because there was a lack of clinical safety testing data, Plaintiff points to nothing in these documents that shows that DJO knew, or had any reason to know, that the use of the I–Flow pain pump in orthopedic surgery would destroy the patient's cartilage. Indeed, the consulting firm did not recommend that DJO opt to cease promoting and distributing the I–Flow pain pump, saying that:

> Given that there are no public health issues at stake, we do not recommend this option. We believe, at a minimum, you can work with FDA while you distribute the PainBuster device, provided you move to education rather than promotion.

(Id. ¶ 20, Ex. 19 at 3.)

At most, what Plaintiff has shown about the FDA approval process is that I–Flow chose not to submit testing or other data to the FDA to show that the I–Flow pain pump could safely and effectively be used in a joint space after orthopedic surgery. This, however, does not constitute prima facie evidence that I–Flow—or DJO—had any information from testing or otherwise that it was not safe to use the pain pump in orthopedic surgery because it would destroy a patient's cartilage.

### ii. Defendants' Marketing of the I–Flow Pain Pump

Any discussion of the marketing of a medical device must begin with the caveat that the regulation of a manufacturer's marketing and distribution of medical devices by the FDA does not extend to the regulation of a physician's practice of medicine. The Food, Drug, and Cosmetic Act expressly provides that "[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner—patient relationship." 21 U.S.C. § 396. When a physician uses a device for some purpose other than that for which it has been approved by the FDA, this is called an "off-label" usage. *Buckman*, 531 U.S. at 350, 121 S.Ct. 1012. Maintaining the physician's discretion to use a medical device, such as the I–Flow pain pump, in an off-label way, "is an accepted and necessary corollary of the FDA's mission to regulate in this area without interfering with the practice of medicine." *Id.* Thus, although Defendants could not label the I–Flow pain pump with an indication for use in the intra-articular site in orthopedic surgery, the lack of § 510(k) clearance for that use did not bar Defendants from selling the device to orthopedic surgeons or other physicians who could then decide how and when to use the device during surgical applications.

That in mind, Plaintiff has submitted no evidence at all about DJO's marketing and distribution of the I–Flow pain pump. There is no information about what the indications for use were on the I–Flow pain pump's product labeling or product inserts when DJO's sales representatives were selling the product, nor is there any evidence about DJO's policies regarding what could be communicated to orthopedic surgeon customers by DJO's sales representatives about the I–Flow pain pump.

Plaintiff also provides virtually no information about I–Flow's own marketing of the pain pump. Plaintiff did submit evidence that I–Flow did not inform its sales representatives and members of its marketing department that I–Flow had failed to obtain FDA clearance to market the pain pumps for use in the intra-articular space and that I–Flow had failed to perform any safety testing to support such a use of the pain pump in orthopedic surgery, but this shows nothing about I–Flow's actual marketing of the device. Plaintiff also submits snippets of deposition testimony from an I–Flow territory manager, Cheryl Lynn Pritchard, who began working at I–Flow in February 2004. She testified that she could not recall how many surgeons she talked to about the I–Flow pain pump, but she did admit that she had never told a surgeon that I–Flow had been denied an indication for intra-articular placement by the FDA. (Doc. No. 69, Simmons Decl. ¶ 12, Ex. 11.) Plaintiff, however, submitted no testimony about what Ms. Pritchard actually told any orthopedic surgeon about the use of the I–Flow pain pump. And Ms. Pritchard did observe during her testimony that there was no contraindication required on I–Flow's labeling with respect to intra-articular use of the device. (*Id.*)

The only other information that Plaintiff provides concerning I–Flow's marketing of the pain pump is testimony from Dr. Patrick O'Connell, the orthopedic surgeon who performed the shoulder surgery on Plaintiff. Dr. O'Connell testified that a sales representative helped him understand the mechanisms of placement of the pain pump's catheter in the joint or in the subacromial space, and that he presumed these to be safe uses for continuous infusion of Marcaine. (*Id.* ¶ 22, Ex. 21 at 116.)

But Plaintiff provides no authority for the proposition that it was inappropriate for an I–Flow or DJO sales representative to educate an orthopedic surgeon who chose to use the pain pump in this off-label manner. Dr. O'Connell also testified that neither this sales representative, nor any other sales representative, told him that the FDA had denied clearance to market the pain pump to orthopedic surgeons for continuous infusion into a joint space, and that he would have been concerned about this if he had been told because he would have wanted to know if there was some reason why he should not begin using the device. (*Id.* at 115–16.) But again, Plaintiff provides no evidence that I–Flow or DJO withheld this information because they knew, or had any reason to know, that Dr. O'Connell's—or any other orthopedic surgeons'—use of the pain pump for postoperative pain management after orthopedic surgery would cause chondrolysis.

### iii. Medical Literature

■■ Plaintiff argues that if I–Flow had done a meaningful review of available medical literature to determine whether use of the pain pump in joint space after orthopedic surgery was safe, I–Flow would have learned "that continuously exposing articular cartilage to anesthetics, or even to normal saline, can have a toxic effect on cartilage cells." (Doc. No. 68, Pl.'s Mem. at 6.) Plaintiff supports this proposition with a document that it describes as a portion of an expert report from Dr. Stephen Trippel. (*See* Doc. No. 69, Simmons Decl. ¶ 11, Ex. 10.) In this partial expert report, Dr. Trippel purportedly describes thirteen articles from medical journals that he says "would have put a careful and prudent and reasonable medical device maker on notice that continuous injection of commonly used anesthetics over a period of two to three days into a joint space would likely harm the cartilage." (*Id.* at 7.) The articles cover a period of time from 1933 through March 2004. (*See id.* at 7–13.)

There are several problems with the submission of this evidence to support Plaintiff's claim for punitive damages. First, this partial expert report does not meet section 549.191's requirement that the motion for leave to amend to allege punitive damages be accompanied by affidavits showing the factual basis for the claim. The partial expert report is not accompanied by an affidavit of Dr. Trippel attesting to anything. Rather, it is attached to a declaration of Plaintiff's attorney who just says that it is a true and correct copy of the portions of Dr. Trippel's expert report referenced in Plaintiff's memorandum. The Court has no way of knowing whether the incomplete report is a final report, or whether it is attested to by Dr. Trippel, as it does not bear his signature.

And even if Dr. Trippel's affidavit would have been produced properly, this evidence suffers from substantive problems as well. None of the thirteen articles cited describe any studies linking the use of a pain pump to slowly infuse an anesthetic into the joint space to chondrolysis. And the last of the thirteen articles—titled "Glenohumeral Chondrolysis After Shoulder Arthroscopic" and published in the *American Journal of Sports Medicine* in March 2004—is the only one that, according to Dr. Trippel, "calls attention to chondrolysis, which was very rare before 2004." (*Id.* at 13.) Yet Dr. Trippel acknowledges that this particular March 2004 study was a report "of only three cases and a review of the literature. From a scientific rigor standpoint, the scientific validity of this study is not high[.]" (*Id.*) Keeping in mind that the second of Plaintiff's surgeries occurred in May, 2004, Dr. Trippel gives the following summary about this March 2004 article:

Other than articles, such as those listed above, that describe the use of a chemical dye and an antiseptic agent a number of years earlier, this is one of the earliest known examples of this particular disease. It's almost like reporting a new disease that had not previously existed, or, if it had existed, recognized. The authors specifically state: "No case reports of glenohumeral chondrolysis after routine shoulder arthroscopy appear in the literature." So this is the first time that the potential association between pain pumps and chondrolysis has been called to anybody's attention.

(*Id.*); *see also Rodriguez v. Stryker Corp.,* No. 2:08–0124, 2011 WL 31462, at *3 (M.D.Tenn. Jan. 5, 2011) ("In his trial testimony in a factually similar case[ ], the plaintiff's general causation expert, Dr. Stephen Trippel, stated that, as of 2005, there were no case reports demonstrating that a patient had experienced cartilage damage from the administration of a local anesthetic by 'any way or manner.'") (footnote omitted).

This lack of any association between pain pumps and chondrolysis is also illustrated by the fact that from the mid–1990's to 2004, when Plaintiff's second surgery was performed, surgeons chose pain pump infusion systems to treat pain management after joint surgery in hundreds of thousands of cases. Yet Plaintiff submits no evidence that a physician ever raised any issue about the use of I–Flow's—or any other manufacturer's—pain pumps causing the destruction of a patient's cartilage resulting in glenohumeral chondrolysis during this time frame. And it was not until November 24, 2009, that the FDA required pain pump manufacturers to update their product labels to warn healthcare professionals about the potential serious adverse effect of chondrolysis from the infusion of a local anesthetic into an intra-articular space for extended periods of time. (Doc. No. 69, Simmons Decl. ¶ 10, Ex. 9.) Al-

though the FDA noted that "single intra-articular injections of local anesthetics in orthopedic procedures have been used for many years without any reported occurrence of chondrolysis," there were thirty-five reports of chondrolysis between 2006 and 2008 occurring in patients administered continuous intra-articular infusions of local anesthetics with pain pumps. (*Id.*) Yet the FDA stated in 2009 that it was not known which specific factor or combination of factors contributed to the development of chondrolysis in these cases: "The infused local anesthetic drugs, the device materials and/or other sources may have resulted in the development of chondrolysis." (*Id.*)

The Court concludes that none of the submitted evidence, including Dr. Trippel's review of the medical literature that was published by March 2004, constitutes clear and convincing evidence that the Defendants knew, or had a reason to know, that use of the I–Flow pain pump in orthopedic surgery would result in a high probability that Plaintiff would suffer devastating cartilage destruction as a result of the post-operative pain management.

## III. Conclusion

Given the status of pain pump litigation around the country, the deficiencies in Plaintiff's presentation of a prima facie case for punitive damages are particularly telling. It has been reported that there are over 200 pain pump product liability cases in which plaintiffs have claimed that post-orthopedic surgery chondrolysis was caused by the use of a pain pump to relieve postoperative pain. *Rodriguez,* 2011 WL 31462, at *3 n. 4. At the oral argument on this motion, counsel reported that six pain pump cases had gone through trial, including four cases where I–Flow was the defendant manufacturer, with three of the I–Flow cases resulting in de-

fense verdicts and one resulting in a plaintiff's verdict, and none having punitive damages awarded. (Doc. No. 83, Tr. 16, 49.) Plaintiff's counsel in this case obviously had a wealth of information available through what has now been years of discovery from Defendants' files to try to make out a prima facie case of entitlement to punitive damages by showing that Defendants knew or had reason to know that there was a high probability that the I–Flow pain pump would injure Plaintiff. Plaintiff has failed to do so. Plaintiff has not met the burden imposed by sections 549.191 and 549.20 to support a claim for punitive damages. Therefore, Plaintiff's motion is denied.